IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| STEVEN V. BIXBY, MARION BOWMAN, JR., MIKAL D. MAHDI, RICHARD BERNARD MOORE, FREDDIE EUGENE OWENS,[1] BRAD KEITH SIGMON<br><br>Plaintiffs,<br><br>v.<br><br>BRYAN P. STIRLING, in his official capacity as the Director of the South Carolina Department of Corrections,<br><br>SOUTH CAROLINA DEPARTMENT OF CORRECTIONS,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

COMPLAINT

No. 3:24-cv-5072-JDA

Plaintiffs, through counsel, bring this action to ensure that their executions by the State of South Carolina are not carried out behind a veil of secrecy that violates their constitutional rights and operates in the absence of reasonable regulatory oversight. Plaintiffs also seek sufficient information to be able to choose an execution procedure that poses the least risk of torture, a right conferred by the state legislature. South Carolina has created an unconstitutional situation by granting Plaintiffs a statutory and due process right to basic facts about the lethal injection drug's creation, quality, and reliability, but denying Plaintiffs, through a secrecy statute, access to the very facts they are entitled to know when choosing their method of execution.

---

[1] In 2015, by order of the Dorchester County Family Court, Mr. Owens's legal name was changed to Khalil Divine Black Sun Allah. However, because all of his prior proceedings before the South Carolina state courts and federal courts have been filed under the name Freddie Owens, this complaint uses the name Owens for clarity.

1

This lawsuit's purpose is not to permanently halt executions. Plaintiffs' aim is only to require State officials to carry out executions with the transparency and access to information about critically-important government functions that the Constitution requires.

## NATURE OF THE ACTION

1.     This action is brought under 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202, for violations and threatened violations of Plaintiffs' state and federal constitutional rights to procedural due process, access to the courts, and their statutory right to the assistance of counsel, as outlined in the claims below.

## JURISDICTION AND VENUE

2.     Jurisdiction is conferred by 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution and laws of the United States, by 28 U.S.C. §§ 2201 and 2202, and by 42 U.S.C. §§ 1983 and 1988, in that this is an action for declaratory judgment and equitable relief to redress deprivations of constitutional rights caused by Defendants under color of state law.

3.     Venue is proper under 28 U.S.C. § 1391(b) in that all Defendants reside in the District of South Carolina, and all events giving rise to this action occurred in this federal district.

## PARTIES

4.     Plaintiffs are citizens of the United States, currently incarcerated under state-imposed sentences of death at Broad River Correctional Institution in Columbia, South Carolina. Plaintiffs are under the control and supervision of the S.C. Department of Corrections, or SCDC.

5.     Defendant SCDC is a division of the State of South Carolina, which is charged with overseeing individuals incarcerated by South Carolina, and charged with providing

equipment for and carrying out executions. S.C. Code § 24-3-520, § 24-3-540. SCDC's headquarters are in Columbia, South Carolina.

6.      Defendant Bryan Stirling is the Director of SCDC. He is charged under state law with overseeing and carrying out executions in South Carolina. S.C. Code § 24-3-510. He is a citizen and resident of South Carolina. Director Stirling is being sued in his official capacity.

## FACTUAL BACKGROUND

7.      From 1995 until 2021, lethal injection was the primary means of execution in South Carolina, and during that time, 36 men elected to die by lethal injection. Only three men opted for electrocution.

8.      The State of South Carolina has not carried out executions since 2011. According to State officials, this period without executions was due, in part, to the reluctance of drug manufacturers and suppliers to provide drugs for executions in a manner that might publicly reveal their identities.

9.      In an initial attempt to address this situation, in 2021, the South Carolina Legislature amended S.C. Code § 24-3-530, making electrocution the default method of execution, but permitting the person sentenced to death to also choose "firing squad or lethal injection, if it is available at the time of election."

10.      Plaintiffs Owens, Sigmon, and Moore filed suit in state court, challenging electrocution, firing squad, and the amendments to S.C. Code § 24-3-530 as unconstitutional under the state constitution. Plaintiffs filed discovery requests seeking information on steps that SCDC had taken to procure lethal injection drugs, and Defendants sought a protective order allowing them to withhold that information, which the circuit court granted.

11.     Following a trial and state circuit court ruling that the methods of execution and related statutes violated the South Carolina Constitution, the Defendants appealed. In January 2023, the South Carolina Supreme Court remanded the case, finding that the trial court abused its discretion by denying discovery. *Owens v. Stirling*, 438 S.C. 352, 360 (2023) ("We find the Inmates' requests for information regarding lethal injection are relevant and necessary for the proper adjudication in this matter."). The lower court was instructed to oversee the completion of discovery, and the remainder of the appeal was held in abeyance.

12.     No additional discovery took place. Instead, Defendants requested an emergency stay of the proceedings while the Legislature considered, and ultimately passed, amendments to S.C. Code § 24-3-580. Prior to its amendment, this statute prohibited disclosure of "the identity of a current or former member of an execution team" absent a "court order under seal for the proper adjudication of pending litigation." S.C. Code § 24-3-580 (Supp. 2022). The new and expanded version of the secrecy law extended this protection to drug suppliers and all other persons or entities associated with the "planning or administration" of an execution. It eliminated the "court order" provision and exempted the purchase of lethal injection drugs from South Carolina's procurement rules, Department of Health and Environmental Control regulations, and pharmacy guidelines. The statute now provides that lethal injection drugs need not be provided by a licensed pharmacist, nor is a prescription from a qualified physician required for anyone to "supply, manufacture, or compound any drug intended for use in the administration of the death penalty."

13.     As amended, S.C. Code § 24-3-580 now provides, in full:

SECTION 24-3-580. Nondisclosure of identity of members of an execution team and the acquisition of drugs to administer a death sentence.

(A) As used in this section, the term:

(1) "Execution team" shall be construed broadly to include any person or entity that participates in the planning or administration of the execution of a death sentence, **including any person or entity that prescribes, compounds, tests, uses, manufactures, imports, transports, distributes, supplies, prepares, or administers the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence.**

(2) "Identifying information" shall be construed broadly to include any record or information that reveals a name, date of birth, social security number, personal identifying information, personal or business contact information, or **professional qualifications**. The term "identifying information" also includes any residential or business address; any residential, personal, or business telephone number; any residential, personal, or business facsimile number; any residential, personal, or business email address; and any residential, personal, or business social media account or username.

(3) "De-identified condition" means data, records, or information from which identifying information is omitted or has been removed.

(B) Notwithstanding any other provision of law, any identifying information of a person or entity that participates in the planning or administration of the execution of a death sentence shall be confidential. For all members of the execution team, identifying information **shall not be subject to discovery, subpoena, or any other means of legal compulsion or process for disclosure to any person or entity in any administrative, civil, or criminal proceeding in the courts, administrative agencies, boards, commissions, legislative bodies, or quasilegislative bodies of this State, or in any other similar body that exercises any part of the sovereignty of the State.**

(C) A person shall not knowingly disclose the identifying information of a current or former member of an execution team or disclose a record that would identify a person as being a current or former member of an execution team. Any person and his immediate family, or entity whose identity is disclosed in violation of this section shall have a civil cause of action against the person who is in violation of this section and may recover actual damages and, upon a showing of a wilful violation of this section, punitive damages. **A person who violates the provisions of this subsection also must be imprisoned not more than three years.**

(D) **Any purchase or acquisition of drugs, medical supplies, and medical equipment necessary to execute a death sentence shall be exempt from the entirety of the South Carolina Procurement Code and all of its attendant regulations.**

(E) The out-of-state acquisition of any drug intended for use by the department in the administration of the death penalty **shall be exempt from all licensing processes and requirements administered by the Department of Health and Environmental Control or by any other department or agency of the State of South Carolina.** Furthermore, the out-of-state acquisition of any drug intended for use by the department in the administration of the death penalty **shall be exempt from all regulations promulgated by the Board of Pharmacy.**

(F) Any pharmacy or pharmacist, whether located within or without the State, that is involved in the supplying, manufacturing, or compounding of any drug intended for use by the department in the administration of the death penalty **shall be exempt from all licensing, dispensing, and possession laws, processes, regulations, and requirements of or administered by the Department of Labor, Licensing and Regulation, the Board of Pharmacy, or any other state agency or entity, found anywhere in the South Carolina Code of Laws or South Carolina Code of Regulations,** only to the extent that the licensing, dispensing, and possession laws, processes, regulations, and requirements pertain to the drugs intended for use in the administration of the death penalty, and no prescription from any physician shall be required for any pharmacy or pharmacist to supply, manufacture, or compound any drug intended for use in the administration of the death penalty. This exemption shall not apply to any licensure or permitting requirements for the supply, manufacture, or compounding of any other legend drug or pharmaceutical device.

(G) Notwithstanding any other provision of law, including the South Carolina Freedom of Information Act, Section 30-4-10, et seq., no department or agency of this State, no political subdivision, and no other government or quasigovernment entity shall disclose the identifying information of any member of an execution team or any details regarding the procurement and administrative processes referenced in subsections (D) through (F).

(H) The Office of the Comptroller General and the Office of the State Treasurer shall work with the South Carolina Department of Corrections to develop a means to ensure that the state's accounting and financial records related to any transaction for the purchase, delivery, invoicing, etc. of or for supplies, compounds, drugs, medical supplies, or medical equipment utilized in the execution of a death sentence are kept in a de-identified condition.

(I) **This section shall be broadly construed by the courts of this State so as to give effect to the General Assembly's intent to ensure the absolute confidentiality of the identifying information of any person or entity directly or indirectly involved in the planning or execution of a death sentence within this State.**

(J) The Department of Corrections shall comply with federal regulations regarding the importation of any execution drugs.

> (K) A member of the General Assembly, a member's immediate family, or any business with which a member or the member's immediate family member has a controlling interest as an owner, director, officer or majority shareholder that has voting rights regarding the business' financial decisions must not offer nor provide drugs, medical supplies, or medical equipment necessary to execute a death sentence.

(emphasis added to pertinent portions of the statute).

14.     Armed with this new secrecy law, in September 2023, Director Stirling informed the state supreme court that the Department of Corrections was able to acquire the drugs needed to carry out lethal injection executions from an unidentified source. Exhibit 1.

15.     In July 2024, the South Carolina Supreme Court issued *Owens v. Stirling*, 904 S.E.2d 580 (S.C. 2024), rejecting state constitutional challenges to the methods of execution. The South Carolina Supreme Court reversed the circuit court's merits determination, holding instead that the methods of execution and their enabling statutes did not violate the state constitution. No issue of federal law was raised in *Owens*.

16.     The *Owens* decision also addressed Plaintiffs' statutory and due process rights to choose their method of execution under § 24-3-530. Per the South Carolina Supreme Court, the statutory choice provision guarantees that "a condemned inmate in South Carolina will never be subjected to execution by a method he contends is more inhumane than another method that is available." *Id.* at 608. The state supreme court explained that the Corrections director, as part of the duty to certify the available methods of execution, "must explain to the condemned inmate . . . the results of his efforts" to obtain execution drugs. The director must also explain "the basis of his determination that the drugs are of sufficient potency, purity, and stability to carry out their intended purpose." *Id.* at 604. The court clarified that the director must provide

"sufficient detail that a condemned inmate and his attorneys may understand whether there is a basis for challenging the constitutionality of the impending execution." *Id.* at 605.

17.    After *Owens* was issued, on August 23, 2024, the Clerk of the South Carolina Supreme Court issued an execution notice to Director Stirling to carry out the execution of Plaintiff Owens. Exhibit 2. Owens' execution is currently scheduled for September 20, 2024.

18.    On August 28, 2024, Director Stirling, pursuant to his statutory duty, served an affidavit on counsel for Plaintiff Owens certifying that all three approved methods of execution are available, and further certifying that lethal injection is available with a single dose of pentobarbital that has been tested by the forensic laboratory of the S.C. Law Enforcement Division, or SLED. Exhibit 3.

19.    In his affidavit, Director Stirling stated that the SLED forensic lab is accredited, used accepted protocols when testing the pentobarbital, and that qualified personnel conducted the tests. Stirling also stated that it was reported to him by SLED that the pentobarbital's concentration, purity, and stability was confirmed. The affidavit, however, does not provide any additional details about SLED's testing, the tests conducted or their results, or about the specific pentobarbital intended for use during Plaintiff Owens' execution.

20.    On August 30, 2024, the state supreme court issued an order establishing a regular interval of at least thirty-five days between the issuance of death notices, and determined that after the issuance of Plaintiff Owens' death notice, the court would issue notices for inmates with exhausted appeals in the following order: (1) Richard Moore, (2) Marion Bowman, Jr., (3) Brad Sigmon, (4) Mikal Mahdi, (5) Steven Bixby. Exhibit 4. These five individuals, along with Mr. Owens, are the Plaintiffs in this suit.

21.     Unless the state supreme court finds that circumstances warrant deviating from the thirty-five day interval, Plaintiffs' executions will be scheduled as follows: Freddie Eugene Owens, September 20, 2024; Richard Bernard Moore, October 25, 2024; Marion Bowman, Jr., November 29, 2024; Brad Keith Sigmon, January 3, 2025; Mikal Deen Mahdi, February 7, 2025; and Steven Vernon Bixby, March 14, 2025.

22.     On September 5, 2024, the South Carolina Supreme Court overruled objections, filed by Plaintiff Owens, to Director Stirling's certification and limited description of the SLED testing performed on the lethal injection drugs, and declined to require Stirling to provide any further information to Owens. Exhibit 5 (Owens's objection); Exhibit 6 (affidavit supporting objection, from pharmacy expert Dr. Michaela Almgren); Exhibit 7 (order denying objections to certification).

23.     On September 6, 2024, with his attempt to obtain additional information having been rejected by the state supreme court, Plaintiff Owens submitted the statutorily-required notice of election, selecting lethal injection as his method of execution. Exhibit 8.

24.     Dr. Michaela Almgren, Pharm.D., MS, is a Clinical Associate Professor in the Department of Clinical Pharmacy and Outcome Sciences at the University of South Carolina College of Pharmacy. Dr. Almgren submitted an affidavit in support of Mr. Owens's objection to Director Stirling's certification. She opined that the limited information about the lethal injection drugs that was offered by Stirling, and approved by the state supreme court, omits critical information for Plaintiffs to be able to make an informed choice about which method of execution poses the least risk of harm:

    a.     The date on which the drugs were tested.

    b.     The Beyond Use Date, after which compounded drugs should not be used.

9

c.     If the drugs were commercially manufactured, the expiration date.

d.     The methods and procedures used to test the pentobarbital, including documentation of test method validation and details of quality control procedures and methodology.

e.     The actual results obtained from the testing.

f.     Where the drugs will be stored prior to their use, and how the storage conditions will be monitored, including temperature and humidity controls.

25.     The secrecy statute, S.C. Code § 24-3-580, on its face, does not restrict access to any of this information.

26.     Dr. Almgren explains in her affidavit that if the pentobarbital used during an execution is expired; past its Beyond Use Date; improperly tested in a way that fails to detect problems with the drug's potency, purity, or stability; or improperly stored in a way that degrades the drug's properties; then serious risks are posed to the person undergoing the execution process. Those risks include intense pain upon injection, regaining consciousness during the execution, or sustaining organ or brain damage from oxygen deficits suffered during an attempted execution.

27.     The need for sufficient information about the integrity of the lethal injection drugs is heightened because of the circumstances under which they were obtained. During the prior state court litigation in *Owens*, Defendants admitted they had to make over 1,300 contacts before obtaining pentobarbital. Exhibit 1 (Affidavit of Defendant Stirling). The difficulty Defendants faced in obtaining the drugs from standard sources raises legitimate questions about the quality of the materials they ultimately were able to acquire.

28.     Likewise, the need for information about the drugs is heightened because of the absolute restrictions the secrecy statute places on disclosure of information relating to the drugs'

source and the circumstances surrounding its creation, *see* § 24-3-580(A)(1), and the exemptions

from licensing and regulatory requirements that the secrecy statute grants to those involved in the

manufacture and procurement of the drugs, *see* § 24-3-580(D) through (H). If these provisions

withstand constitutional challenge, it will become even more essential that Defendants provide

adequate information about testing and storage procedures to ensure the drugs are what

Defendants claim they are, and also to ensure they will not degrade prior to their use in an

execution.

29.     It has also been over a decade since South Carolina corrections officials have

performed an execution. This lack of experience creates a higher risk of error and

correspondingly greater need for information to demonstrate that the execution planning process

is occurring with appropriate safeguards.

30.     In addition to withholding information about the lethal injection drugs, Plaintiffs

are unable to access information about the "professional qualifications" of members of the

execution team who will set up, prepare, and administer the lethal injection process. Disclosure

of this information is expressly prohibited by the secrecy statute. *See* S.C. Code. § 24-3-

580(A)(2).

31.     Plaintiffs cannot make an informed choice about their method of execution in the

absence of information about whether the lethal injection team is appropriately trained and

qualified. According to reports maintained by the Death Penalty Information Center, over the

past decade, there have been 18 botched executions, five of which failed completely. A

substantial portion of these botched executions involved protracted difficulty in setting up IV

lines. In one case a prisoner even had to assist the execution team in bringing about his own

death by suggesting a good spot to start an IV line.[2] Without question, in order to meaningfully exercise their state-granted right to choose between execution procedures, Plaintiffs need to know the training and qualifications of the execution team so they can assess the risk of serious and painful IV-related errors. Yet the secrecy statute bars Plaintiffs from finding out whether the execution team members who are setting up their IV access are properly trained and qualified.

32.    Finally, in § 24-3-580(J), the secrecy statute requires the Department of Corrections to "comply with federal regulations regarding the importation of any execution drugs." Yet the secrecy statute prevents Plaintiffs, or any member of the public, or even South Carolina officials outside SCDC, from knowing whether federal compliance is taking place. Subsection (A)(1) of the statute defines "Execution team" to include any person or entity who "imports" the drugs. Subsection (C) prohibits the disclosure of "a record that would identify a person as being a current or former member of an execution team," which, as noted, includes those importing the drugs. And under subsection (G), "no department or agency" of South Carolina "shall disclose . . . any details regarding the procurement and administrative processes" relating to the execution drugs. Thus, the secrecy statute creates a federal compliance requirement, but arbitrarily prohibits any mechanism for ensuring that compliance is actually happening.

---

[2] *See* https://deathpenaltyinfo.org/executions/botched-executions.

## CLAIMS FOR RELIEF

### CLAIM ONE
**Deprivation of Procedural Due Process**
*As-Applied Challenge to Refusal to Provide Necessary Information*

33.     Plaintiffs incorporate by reference all statements and allegations in this complaint.

34.     Plaintiffs are entitled to due process of law under the Fourteenth Amendment to the U.S. Constitution and Article I, Section 3 of the S.C. Constitution.

35.     The procedural protections that due process provides may be invoked when there is "[a] liberty interest [that] arise[s] from the Constitution itself . . . or it may arise from an expectation or interest created by state law or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Both types of interests are present here.

36.     As alleged above, Plaintiffs requested certain information about the potency, purity, and stability of the drugs that may be used for their executions. Defendants refused to provide that information, and the South Carolina Supreme Court overruled Plaintiffs' objections to Director Stirling's sparse description of the testing conducted on the execution drugs.

37.     Defendants' and the state supreme court's refusal to provide the requested material implicates Plaintiffs' constitutional liberty interest in being free from cruel and unusual punishment that causes needless suffering. Without adequate information, Plaintiffs have no way of determining whether there is a basis for challenging the constitutionality of lethal injection, nor are they able to meaningfully litigate any such claim. Plaintiffs must be provided with the information Dr. Almgren has identified in order to know whether Defendants' lethal injection procedures meet Eighth Amendment standards. As Dr. Almgren explains, if the drugs and their storage conditions do not meet certain criteria, there is a risk they will cause Plaintiffs serious pain during their executions.

38.     In addition to the constitutional liberty interest, Plaintiffs have a state-created right to information about the methods of execution. *See Owens*, 904 S.E.2d at 605 (holding that S.C. Code § 24-3-530(B) "requires . . . that the Director set forth that process in sufficient detail that a condemned inmate and his attorneys may understand whether there is a basis for challenging the constitutionality of the impending execution," and explaining "[t]here is a Due Process Clause component to [this] analysis . . . ."). Similarly, Plaintiffs have a statutory right to choose among the available methods of execution. *Id.* at 608 (explaining that under S.C. Code § 24-3-530, "the condemned inmate may elect to have the State employ the method he and his lawyers believe will cause him the least pain."). The state supreme court guaranteed in *Owens* that "a condemned inmate in South Carolina will never be subjected to execution by a method he contends is more inhumane than another method that is available." *Id.* at 608.

39.     Defendants' and the state supreme court's refusal to provide the material requested implicates Plaintiffs' state-created rights to information and to choose their method of execution. In the absence of adequate information, the statutory right to elect a method of execution is functionally meaningless, and in effect, arbitrarily revoked. *See D.A.'s Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009) (explaining that a "state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right.") (internal quotations and citations omitted); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (holding that "an arbitrary disregard of the petitioner's [state-created procedural] right to liberty is a denial of due process of law.").

40.     Because both constitutional and state-created liberty interests are at stake, Plaintiffs are entitled to procedural due process protections.

41.     As a general matter, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations and citation omitted). When implementing this guarantee, the question becomes: "what process is due prior to the" deprivation of the liberty interest at stake? *Id.* Because due process is not a legal rule with "fixed content," the inquiry "is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334. The Court must balance three factors: the private interest affected by official actions; the risk of an erroneous deprivation of that interest through the procedures used and the value of additional safeguards; and third, the state interest involved and any burdens that additional procedural safeguards might impose. *Id.* at 334-35.

42.     Each of these factors weighs in favor of requiring Defendants to provide the information Plaintiffs seek about the lethal injection drugs. There can be no doubt the private interest—the right not to suffer a torturous death—carries great weight. *See Louisiana ex rel Francis v. Resweber*, 329 U.S. 459, 463 (1947) (plurality opinion) ("The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence."). Likewise, as Plaintiffs have alleged, if the lethal injection drugs do not meet certain specifications, there is a substantial risk their executions by lethal injection could deprive them of the right to be free from cruel and unusual punishment; and without adequate knowledge of lethal injection's risks, Plaintiffs will be deprived of their state-granted right to make an informed choice among the available execution methods. Third and finally, because all that Plaintiffs seek is information about drugs that Defendants have already obtained—and presumably have already taken steps to assure those drugs are adequate to carry out executions

without violating constitutional guarantees—there is virtually no burden imposed on the State in simply asking it to share that information.

43.     Accordingly, Defendants' and the state supreme court's refusal to provide the information that Plaintiffs seek about lethal injection drugs is a violation of Plaintiffs' state and federal rights to procedural due process. To the extent Defendants claim their refusal to provide information is required by the secrecy statute, S.C. Code § 24-3-580, Defendants' interpretation of that statute also violates Plaintiffs' procedural due process rights.

**CLAIM TWO**
**Deprivation of Procedural Due Process**
***Facial Challenge to the Secrecy Statute's Prohibition on Critical Safeguards***

44.     Plaintiffs incorporate by reference all statements and allegations in this complaint, including the procedural due process framework explained in Claim One.

45.     S.C. Code § 24-3-580 imposes an absolute prohibition on the disclosure of critical information that affects whether Plaintiffs' executions will pose a substantial risk of serious pain. The denial of this information also impairs Plaintiffs' ability to make an informed and meaningful choice about their method of execution, a right conferred on Plaintiffs by state law.

46.     In addition to a state-created right to certain information about the execution drugs, § 24-3-580(J) establishes Plaintiffs' interest in Defendant SCDC "comply[ing] with federal regulations regarding the importation of any execution drugs." As explained below, the very same statute impairs that interest by preventing Plaintiffs from finding out the information needed to confirm that actual compliance has occurred.

47.     Denial of information about the manufacturing or compounding process: The secrecy statute prohibits disclosure of the professional qualifications of any person or entity that compounds or manufactures execution drugs. *See* S.C. Code § 24-3-580(A)(1), (A)(2), and (B).

16

On information and belief, the qualifications of those involved in producing the execution drugs is relevant to whether there is a risk those drugs will lack the potency, purity, and stability needed to bring about death without inflicting serious pain. In other words, an unqualified or unreliable drug manufacturer is far more likely to produce ineffectual or dangerous pentobarbital. For example, if the drug manufacturing or compounding process is not followed properly, there is a risk the drug will be a heterogeneous mixture with undissolved solids, which in turn would pose a risk of extreme pain and suffering if injected.

48.    <u>Denial of information about the execution team's professional qualifications</u>: In subsections (A)(1), (A)(2), and (B), the secrecy statute forbids access to the professional qualifications of members of the execution team. Plaintiffs are particularly concerned with their inability to obtain information about the training and qualifications of those who prepare and administer the execution drugs, as numerous executions around the country were botched when corrections staff engaged in prolonged, painful, and sometimes unsuccessful attempts to establish IV lines for injection.

49.    <u>Exemption from regulatory and licensing requirements</u>: The secrecy statute exempts the execution process from a range of regulatory and licensing safeguards. For example, under subsection (D), the purchase or acquisition of drugs or any other supplies is exempt from the South Carolina Procurement Code.[3] Under subsection (E) of the secrecy statute, out-of-state acquisitions of execution drugs are exempt from oversight by the Department of Health and Environmental Control and from the Board of Pharmacy. Under subsection (F), any pharmacist

---

[3] *See also* S.C. Code § 11-35-20(2)(g) (explaining that an underlying purpose of the Procurement Code is "to provide safeguards for the maintenance of a procurement system of quality and integrity with clearly defined rules for ethical behavior on the part of all persons engaged in the public procurement process.").

involved in the creation of the execution drugs is exempt from licensing and regulatory oversight.

50.     On information and belief, regulation of the manufacture of pharmaceuticals ensures that a drug is what it purports to be and will function as it is supposed to. These regulations also ensure that facilities producing these drugs are doing so safely and according to the proper pharmaceutical recipes. Not requiring producers to abide by regulations creates risks of insufficient potency, contamination, or being an entirely different substance than indicated on the label. These risks may lead to a failed or torturous execution.

51.     Denial of information about compliance with federal regulations regarding importation of execution drugs: In subsection (J), the secrecy statute requires compliance with federal regulation of drug importation, but in subsections (A)(1), (C), and (G), prohibits disclosure of the information necessary to determine whether federal compliance has actually occurred. For example, subsection (G) prohibits disclosure of "details regarding the procurement and administrative processes . . . ."

52.     On information and belief, the absence of each of the foregoing four types of safeguards increases the risk that execution drugs will lack the potency, purity, and stability needed to bring about death without inflicting serious pain.

53.     Each of the procedural due process factors weighs in favor of requiring Defendants to provide the foregoing information, and to follow licensing and regulatory requirements. The Court should hold that the secrecy statute's provisions to the contrary violate procedural due process.

54.     The first and second procedural due process factors weigh heavily in Plaintiffs' favor. By denying critical information and lifting key licensing and regulatory safeguards, the

secrecy statute impairs Plaintiffs' constitutional interest in their right to be free from a substantial risk of serious pain. The denial of information about the manufacturing or compounding process, and about the execution team's qualifications, also limits Plaintiffs' ability to exercise their state-granted right to choose a method of execution that is less inhumane than other options. Without knowing the risk that each method poses, Plaintiffs cannot meaningfully exercise their right to choose the manner of death that poses the least risk of torture or serious pain.

55.    The chances these constitutional and statutory interests will be impaired is not theoretical. One study of botched executions showed that lethal injection had the highest risk of error, with about 7% of lethal injections resulting in an error of some kind.[4] Another analysis of more than 200 autopsies of people executed by lethal injection found that 84% had evidence of pulmonary edema, a condition in which the lungs fill with fluid and create a feeling of suffocation or drowning akin to waterboarding.[5] In 2022 alone, there were seven lethal injection procedures across the country where serious errors occurred, or at a minimum, evidence strongly suggested error and the infliction of serious pain.[6]

56.    The final procedural due process factor—burdens imposed on the State's interest—supports Plaintiffs' position as well. Of course, the State has a legitimate interest in carrying out sentences that are authorized by law. The State has a corresponding interest in obtaining the equipment and materials needed to carry out those sentences, an interest that the

---

[4] https://deathpenaltyinfo.org/executions/botched-executions (describing Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* (Stanford Univ. Press 2014)).

[5] https://www.npr.org/2020/09/21/793177589/gasping-for-air-autopsies-reveal-troubling-effects-of-lethal-injection.

[6] This information is compiled on the Death Penalty Information Center page on botched executions, linked above.

secrecy statute is designed to protect. However, the secrecy statute sweeps far more broadly than is necessary to effectuate those interests. Plaintiffs are not objecting to the confidentiality of the identity of those involved in executions, or those who provide execution drugs. Plaintiffs are not objecting to appropriately redacted documents. Nor would Plaintiffs object to protective orders allowing information to be provided subject to strictly enforced limitations on public disclosure. The information Plaintiffs seek can be provided without disclosing any person or entity's identity.

57.    Moreover, the lifting of all licensing and regulatory requirements appears to relate more to the convenience of carrying out executions rather than Defendants' ability to do so. The State's interest in administrative ease and convenience should not be given much weight, particularly when balanced against Plaintiffs' liberty interest in being free from a risk of serious pain and statutory interest in being able to select a less inhumane method of execution.

58.    Accordingly, the provisions of S.C. Code § 24-3-580 discussed here, on their face, violate Plaintiffs' state and federal rights to procedural due process.

## CLAIM THREE
### Deprivation of Access to the Courts
***Challenge to Denial of Access to Necessary Information to Litigate Eighth Amendment Claim***

59.    Plaintiffs incorporate by reference all statements and allegations in this complaint.

60.    As alleged above in Claim One, Plaintiffs requested of Defendants certain information about the potency, purity, and stability of the drugs that may be used for their executions; Defendants refused to provide that information, and the state supreme court refused to compel its disclosure.

61.    As alleged above in Claim Two, the secrecy statute, on its face, prohibits disclosure of certain categories of information that are essential to Plaintiffs' ability to make a

meaningful choice about which method of execution will pose a lesser risk of torture than other methods.

62.    Defendants' refusal to provide relevant information to Plaintiffs, and the secrecy statute's categorical ban on disclosure of certain information, violates Plaintiffs' fundamental constitutional right to petition the government for redress of grievances and meaningful access to the courts in violation of the First and Fourteenth Amendments to the U.S. Constitution, *Bounds v. Smith*, 430 U.S. 817, 821 (1977), and the S.C. Constitution, art. I, § 22.

63.    In *Bounds*, the Supreme Court held that prisoners must be afforded "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds*, 430 U.S. at 825. "Prisoners have a constitutional right to 'adequate, effective, and meaningful' access to the courts." *Pronin v. Johnson*, 628 Fed. Appx. 160, 161, (4th Cir. 2015) (quoting *Bounds*, 430 U.S. at 42).

64.    This right of access to courts, thus, advances the due process notion that the aggrieved have "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds*, 430 U.S. at 825); *see also Murray v. Giarratano*, 492 U.S. 1, 11, n. 6 (1989) (plurality opinion) (holding that access to courts is a due process right).

65.    Though they are prisoners, Plaintiffs are "individual citizen[s]" with First Amendment rights of access to governmental proceedings. A prisoner retains those First Amendment rights as long as they are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. As explained above in Claims One and Two, the potential State interests at stake here are either outweighed by Plaintiffs' interests,

or the ways in which Defendants and the secrecy statute seek to protect State interests are far broader than is necessary to effectuate the State's goals.

66.     The right of access to the courts is especially critical where a prisoner's access to other remedies is limited. State action that denies a plaintiff the opportunity to litigate gives rise to a claim that the State is violating the plaintiff's right of access to the courts. The right of access to the courts is an ancillary claim, which is necessary for the vindication of underlying rights.

67.     To establish a claim of denial of access to courts, a prisoner must allege an actual injury or a specific harm which has resulted from the denial. *Strickler v. Waters*, 989 F.2d 1375, 1383 (4th Cir. 1995). Here, by refusing to provide critical information about their executions, Defendants and the secrecy statute are depriving Plaintiffs of a meaningful opportunity to litigate claims that their executions may be torturous.

68.     By deliberately concealing information about the potency, purity and stability of the pentobarbital that Defendants plan to use to execute Plaintiffs, Defendants are actively preventing Plaintiffs from vindicating their Eighth Amendment rights. As a result, Defendants are interfering with Plaintiffs' First and Fourteenth Amendment rights to "adequate, effective, and meaningful" access to the courts. *See Bounds* at 822-823.

69.     Defendants' refusal to provide the information that Plaintiffs seek, and the secrecy statute's ban on disclosure of certain types of information, violates Plaintiffs' state and federal rights of meaningful access to the courts. To the extent Defendants claim their refusal to provide information is required by S.C. Code § 24-3-580, Defendants' interpretation of that statute also violates Plaintiffs' constitutional right of access to the courts.

## CLAIM FOUR
## Deprivation of the Right to Counsel
### *Challenge to Denial of Necessary Information to Meaningfully Provide Counsel*

70.     Plaintiffs incorporate by reference all statements and allegations in this complaint.

71.     The Criminal Justice Act, or CJA, and its policies, require that a district court appoint counsel for a financially eligible person who is seeking to set aside or vacate a death sentence under 28 U.S.C. § 2254. *See* 18 U.S.C. § 3006A(a)(1). Counsel appointed to represent prisoners sentenced to death in state court, in those prisoners' federal habeas corpus proceedings, are also required to continue the representation through the conclusion of state clemency proceedings. *Harbison v. Bell*, 556 U.S. 180 (2009).

72.     Plaintiffs' counsel in their federal habeas proceedings were all appointed pursuant to the CJA, as well as 18 U.S.C. § 3599, which authorized appointment of counsel in capital cases.

73.     By denying Plaintiffs and their counsel access to the information needed to make a fully informed decision about Plaintiffs' chosen method of execution, Defendants and the secrecy statute have constructively denied Plaintiffs their statutory right to the assistance of counsel.

## REQUESTS FOR RELIEF

74.     In light of the constitutional and statutory violations outlined above, Plaintiffs request that the Court grant the following relief:

> a.     A preliminary and ultimately permanent injunction prohibiting Defendants from carrying out Plaintiffs' executions without providing the information they have requested with sufficient notice of at least 23 days ahead of their

executions.[7] As explained above, Plaintiffs seek the professional

qualifications of the execution team, as well as the following information

about the execution drugs:

    i.    The date on which the drugs were tested.

    ii.    The Beyond Use Date, after which compounded drugs should not be used.

    iii.    If the drugs were commercially manufactured, the expiration date.

    iv.    The methods and procedures used to test the pentobarbital, including documentation of test method validation and details of quality control procedures and methodology.

    v.    The actual results obtained from the testing.

    vi.    Where the drugs will be stored prior to their use, and how the storage conditions will be monitored, including temperature and humidity controls.

b.    A preliminary and permanent injunction prohibiting Plaintiffs' executions

until Defendants have complied with the licensing and regulatory

requirements addressed in Claim Two.

c.    Declaratory relief, pursuant to 28 U.S.C. § 2201, that Plaintiffs'

constitutional and statutory rights have been violated as described in this

complaint.

d.    Any other relief the Court deems just and proper.

---

[7] This proposed timing accounts for the fact that South Carolina law provides for a maximum of 28 days between an execution notice issuing and the actual execution date, and also requires the corrections director to certify the available methods of execution within five days of the execution notice issuing. *See Owens*, 904 S.E.2d at 604, n.23 (setting forth the timing of events relating to executions).

Respectfully submitted,

*/s/ Gabrielle Amber Pittman*
Gabrielle Amber Pittman
Deputy Chief
Capital Habeas Unit for the Fourth Circuit
G_Amber_Pittman@fd.org

David Weiss
Assistant Federal Public Defender
Capital Habeas Unit for the Fourth Circuit
David_C_Weiss@fd.org

Federal Public Defender
for the Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 688-6946

*/s/ Lindsey S. Vann*
Lindsey S. Vann
JUSTICE 360
900 Elmwood Avenue, Suite 200
Columbia, SC 29201
Lindsey@justice360sc.org

*/s/ Joshua Snow Kendrick*
Joshua Snow Kendrick
KENDRICK & LEONARD, P.C.
P.O. Box 6938
Greenville, SC 29606
Josh@kendrickleonard.com

COUNSEL FOR PLAINTIFFS

September 13, 2024