THE STATE OF SOUTH CAROLINA
IN THE SUPREME COURT

RECEIVED

Sep 03 2024

S.C. SUPREME COURT

_____

STATE OF SOUTH CAROLINA,
*Respondent*,

v.

FREDDIE EUGENE OWENS,
*Appellant*.

_____

Appellate Case No. 1999-011364
_____

**OBJECTION TO AFFIDAVIT AND CERTIFICATION OF BRYAN P. STIRLING, DIRECTOR, SOUTH CAROLINA DEPARTMENT OF CORRECTIONS**

Khalil Allah, also known as Freddie Eugene Owens, objects to the sufficiency of the August 28, 2024, affidavit of Bryan P. Stirling certifying the methods of execution available for his execution on September 20, 2024, as it does not provide the "basic facts about the drug's creation, quality, and reliability" that this Court has held South Carolina law and the Due Process Clause require. *Owens et al. v. Stirling*, No. 2022-001280 (S.C. July 31, 2024) ("Op.") at 50. In support of his objection, Mr. Owens shows as follows:

Upon receiving a notice of execution, the director of the South Carolina Department of Corrections must "determine and certify by affidavit under penalty of perjury to the Supreme Court whether the methods [of execution] provided" by the state's capital punishment statute— electrocution, the firing squad, and lethal injection—"are available." § 24-3-530(B). As to lethal injection, this Court held in *Owens* that the director must set forth the "process that he decides is appropriate for satisfying himself that the drugs are capable of carrying out the death sentence according to law…. in sufficient detail that a condemned inmate and his attorneys may understand

whether there is a basis for challenging the constitutionality of the impending execution." Op. at 51. While ordering the director to comply with the shield law, this Court further held that the statute requires the director to disclose "some basic facts about the drug's creation, quality, and reliability" and "the drugs' potency, purity, and stability." Op. at 50.[1] This Court illustrated this requirement with the following example:

> [I]f the Director certified in the affidavit that scientists at the Forensic Services Lab of the South Carolina Law Enforcement Division (SLED), whose experience and qualifications were verified by the Director and the Chief of SLED, recently performed testing according to widely accepted testing protocols and found the drugs were not only stable, but of a clearly acceptable degree of purity, then we doubt there could be any legitimate legal basis on which to mount a challenge.

*Id.*

Director Stirling has now submitted his affidavit. Although the affidavit hews somewhat to the example provided by the Court, it does not provide the basic facts that the statute or due process require, as it still requires a condemned prisoner to accept the good-faith word of the Director without any affirmative proof of findings on the part of SCDC or SLED. Mr. Owens has consulted with Dr. Michaela Almgren, a Clinical Associate Professor in the Department of Clinical Pharmacy and Outcomes Sciences at the University of South Carolina College of Pharmacy. *See* Affidavit of Dr. Michaela Almgren, Attachment 1. As Dr. Almgren details, the director's affidavit does not provide the basic facts needed "to assess the qualities and reliability of the lethal injection drugs the department has obtained for use in [Mr. Owens's] execution."

Not only does the affidavit lack "basic facts about the drug's creation," Op. at 50, it provides no facts whatsoever. Most critically, the affidavit provides neither "the date when the

---

[1] This Court noted that there is also "a Due Process Clause component to our analysis of this claim[.]"

drugs were tested" or their "'Beyond Use Date,' or BUD"—the basic facts needed to assess whether "the drugs will still be effective on September 20, when the department intends to use them." *Id.* at ¶ 5. That concern is amplified here because the drugs appear to be compounded. *Id.* Compounded drugs "are typically made in smaller batches and do not go through the same level of testing [as commercially manufactured drugs], so their stability over time is less certain." *Id*. As Dr. Almgren notes, "[e]ven if a compounded drug passes all USP-required quality tests today, it is still important to know its BUD to ensure that the testing accurately reflects the drug's properties on September 20, provided that the BUD extends beyond that date." *Id.* [2]

The affidavit also provides no facts about the "quality[] and reliability" or the "potency, purity, and stability" of the drugs. Op. at 50. While the affidavit "describes reports the director received from SLED personnel concerning the testing of the drugs," it "does not specify the test methods used, the testing procedures followed, or the actual results obtained from those tests." *Id.* at ¶ 6.[3] As a result, the affidavit does not establish that "the SLED laboratory followed all established steps for pharmaceutical drug quality analysis as specified in the USP compendium, which usually differ from typical forensic practice." *Id.* The absence of these basic facts could be corrected by the provision of "the actual analytical reports from the testing of the drugs," which are "standard records produced during this type of laboratory analysis." *Id.*[4]

---

[2] The United States Pharmacopeia ("USP") "sets standards for the identity, strength, quality, and purity of medicines, food ingredients, and dietary supplements in the United States." *Id.* at ¶ 2, n. 1.

[3] Dr. Almgren also observes that the affidavit's language describing the testing results—such as its conclusory statement that SLED personnel "'acknowledged the substance's concentration in terms of its purity and stability'"—"lacks clarity." *Id.* at ¶ 6.

[4] To comply with South Carolina's shield statute, any identifying information for the SLED analysts who conducted the testing could be readily redacted from the analytical reports.

The affidavit provides no facts about "how the storage conditions [of the drugs] will be monitored between now and September 20"—a nearly three-week timeframe that would provide "ample opportunity for quality issues to arise with these drugs if they are not stored correctly, as medications—especially compounded drugs—are sensitive to moisture, light, and temperature." *Id.* at ¶ 7. As Dr. Almgren notes, "simple measures can be implemented to assure that the drug quality is preserved." *Id.* The USP clearly defines the proper storage conditions for drugs, which can be assured by a daily check that the storage location is within the established range of temperature or humidity. *Id.*

As Dr. Almgren confirms, all of these basic facts can be established through the provision of the actual testing results, along with confirmation that the drugs are not beyond their BUD and are being maintained through these well-established and straightforward measures. These are not abstract concerns. Were "the department's drugs degraded" or "their testing . . . improperly conducted or incomplete, they would pose serious risks," including "extensive damage to the blood vessels and surrounding tissue," the infliction of "intense pain upon injection," or even that the execution would fail, leaving Mr. Owens "with organ or brain damage from the oxygen deficits suffered during the attempt at execution." *Id.* at ¶ 8.

Without the basic facts detailed above, Mr. Owens and his counsel cannot assess or "understand whether there is a basis for challenging the constitutionality of the impending execution." Op. at 51. Nor can Mr. Owens or his counsel make an adequately informed election—which undermines the purpose of "the choice provisions of section § 24-3-530" to ensure that "a condemned inmate in South Carolina will *never* be subjected to execution by a method he contends is more inhumane than another method that is available." Op. at 39 (emphasis added). Accordingly, the affidavit's omission of these basic facts implicates his statutory and due process rights.

Mr. Owens accordingly objects to the adequacy of the director's affidavit and certification. As Mr. Owens's method of execution must be elected by September 6, 2024—in less than one week—he requests that this Court enter an order instructing Director Stirling to provide the actual report and results from the testing of the lethal injection drugs intended for use in Mr. Owens's execution (with the identity of the analyst redacted) and documentation of the drugs' beyond use date and storage conditions.

August 31, 2024.

Respectfully submitted,

Gerald W. King, Jr.
Chief, Capital Habeas Unit
for the Fourth Circuit
Gerald_King@fd.org

*s/ Gabrielle Amber Pittman*
Gabrielle Amber Pittman (No. 71771)
Deputy Chief, Capital Habeas Unit
for the Fourth Circuit
G_Amber_Pittman@fd.org

129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 688-6946
August 31, 2024

*s/ Joshua Snow Kendrick*
Joshua Snow Kendrick (No. 70453)
KENDRICK & LEONARD, P.C.
P.O. Box 6938
Greenville, SC 29606
Josh@KendrickLeonard.com

5