# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| STEVEN V. BIXBY, MARION BOWMAN, JR., MIKAL D. MAHDI, RICHARD BERNARD MOORE, FREDDIE EUGENE OWENS, and BRAD KEITH SIGMON,<br><br>*Plaintiffs*,<br><br>v.<br><br>BRYAN P. STIRLING, in his official capacity as the Director of the South Carolina Department of Corrections; and SOUTH CAROLINA DEPARTMENT OF CORRECTIONS,<br><br>*Defendants*,<br><br>and<br><br>HENRY DARGAN MCMASTER, in his official capacity as Governor of the State of South Carolina,<br><br>*Intervenor–Defendant*. | Civil Action No.: 3:24-cv-5072-JDA<br><br>**GOVERNOR MCMASTER, DIRECTOR STIRLING, & SCDC'S MOTION TO DISMISS** |

Henry Dargan McMaster, in his official capacity as Governor of the State of South Carolina; Bryan P. Stirling, in his official capacity as the Director of the South Carolina Department of Corrections ("SCDC"); and SCDC move to dismiss Plaintiffs' Complaint (ECF No. 1) under Federal Rules of Civil Procedure 12(b)(1) and (6).[1]

## INTRODUCTION

South Carolina can carry out an execution by lethal injection only because of the Shield Statute, which protects the identity of anyone who "compounds," "manufacturers," or "supplies" lethal injection drugs (as well as anyone else involved in carrying out an execution). S.C. Code

---

[1] Under Local Civil Rule 7.04 (D.S.C.), a full explanation of the motion is provided in this document, so a separate memorandum would serve no useful purpose.

Ann. § 24-3-580(A)(1). Having exhausted challenges to their convictions and sentences, Death Row Inmates now challenge this Shield Statute. They frame their four claims differently, but they all flow from the same flawed premise that Death Row Inmates have a constitutional right to obtain more information about lethal injection drugs.

Death Row Inmates are wrong. Nothing in federal law requires South Carolina to give them additional information. That the S.C. General Assembly, as an act of legislative grace, offers them the chance to elect a method of execution does not mean that they also have a right to more information than the S.C. Supreme Court has already guaranteed them. *See Owens v. Stirling*, 443 S.C. 246, 293, 904 S.E.2d 580, 605 (2024) (the Director must explain "how he determined the drugs were of sufficient 'potency, purity, and stability' to carry out their intended purpose"). Nor is there a facial problem with the Shield Statute. Against the backdrop of years of lobbying by anti-death penalty advocates, the State concluded that ensuring those involved with supplying lethal injection drugs are not publicly identified was the only way to make lethal injection available. The Shield Statute reflects this reality and promotes the State's "significant interest in enforcing its criminal judgments." *Nelson v. Campbell*, 541 U.S. 637, 650 (2004). Death Row Inmates have no right to "discover grievances" about how the State carries out this interest to enable them to bring lawsuits. *Lewis v. Casey*, 518 U.S. 343, 354 (1996) (emphasis omitted). And they cannot do through their lawyers what they cannot do themselves.

Of course, all this matters only if Death Row Inmates will elect lethal injection. South Carolina also gives them the option to choose electrocution or the firing squad. *See* S.C. Code Ann. § 24-3-530(A). Sigmon and Moore have already admitted in state court that a single dose of pentobarbital is "the most reliable and humane way to conduct a lethal injection." R. p. 113, No. 2022-001280 (S.C. Oct. 27, 2022). Presumably Bixby, Bowman, and Mahdi take this view as well.

Otherwise, they would not have sued for more information about the lethal injection drugs. Thus, they have implicitly acknowledged that they cannot bring a facial challenge to their option to proceed with execution by lethal injection using a single dose of pentobarbital under the Eighth Amendment.

Death Row Inmates' claims should be dismissed, and this lawsuit is no basis to prevent South Carolina from carrying out duly imposed death sentences after Death Row Inmates were convicted of brutal murders many years ago.

## STATEMENT OF FACTS

**A.      Death Row Inmates are convicted of heinous crimes.**

Plaintiffs are five[2] Death Row Inmates. Brad Sigmon killed two people "by repeatedly striking them in their heads with a baseball bat." *State v. Sigmon*, 366 S.C. 552, 554, 623 S.E.2d 648, 649 (2005). Richard Moore shot his victim during a robbery before running off with the money. *State v. Moore*, 357 S.C. 458, 461, 593 S.E.2d 608, 610 (2004). Steven Bixby had a dispute with SCDOT about a right of way that led him to kill a law enforcement officer during an hours' long standoff. *State v. Bixby*, 388 S.C. 528, 535–40, 698 S.E.2d 572, 576–78 (2010). Marion Bowman shot a woman who he claimed owed him money, then burned her body inside her car. *State v. Bowman*, 366 S.C. 485, 489–92, 623 S.E.2d 378, 380–82 (2005). And Mikal Mahdi shot his victim nine times (three times in the head) before he "poured diesel fuel over the body and lit it." *Mahdi v. State*, 383 S.C. 135, 137, 678 S.E.2d 807, 808 (2009). Death Row Inmates were sentenced to death and have exhausted their direct and collateral appeals.

---

[2] It was originally six, but Owens was executed, without complication, by lethal injection on September 20, 2024.

**B.      South Carolina amends its methods-of-execution statute.**

From 1995 until May 2021, South Carolina law authorized electrocution and lethal injection for carrying out a death sentence. *See* 1995 S.C. Acts No. 108, § 1 (codified at S.C. Code Ann. § 24-3-530(A) (2007)). Under that statutory framework, an inmate had to elect one of those methods 14 days before his execution; if he made no election, lethal injection was the default method. *See id.*

Between 2013 and 2023, SCDC could not obtain the drugs necessary for lethal injection. SCDC therefore could not execute a condemned inmate who did not affirmatively elect electrocution. In other words, even after a condemned inmate had exhausted his direct appeals and collateral challenges, SCDC could not carry out death sentences upon receiving an execution notice unless the condemned inmate chose electrocution. Without such an election, there was a de facto inmate-imposed moratorium on executions in South Carolina.

The General Assembly amended the methods-of-execution statute, on a bipartisan basis, for the specific purpose of resolving the quandary in which SCDC found itself. In 2021, the General Assembly passed and Governor McMaster signed into law Act 43. That act changed the default method of execution to electrocution and added the firing squad as a third statutorily approved method. *See* 2021 S.C. Acts No. 43, § 1 (amending S.C. Code Ann. § 24-3-530). Under the act, a "person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by electrocution or, at the election of the convicted person, by firing squad or lethal injection, if it is available at the time of election." *Id.*

Act 43 retained a condemned inmate's ability to elect a method of execution if more than electrocution is available. SCDC must notify an inmate of his opportunity to elect a method and which methods are available through a certification of available methods that the Director files

with the S.C. Supreme Court. *Id.* If the inmate does not make an election within 14 days of his execution, or if lethal injection and the firing squad are unavailable, electrocution is the default method. *Id.* Finally, the Act makes clear that it "applies to persons sentenced to death as provided by law prior to and after [its] effective date." *Id.* § 3.

**C.    South Carolina enacts the Shield Statute, and SCDC obtains pentobarbital.**

Act 43 was quickly challenged by condemned inmates, including several Plaintiffs here. The S.C. Supreme Court initially remanded the case for more discovery on why SCDC had been unable to obtain lethal injection drugs. *See Owens v. Stirling*, 438 S.C. 352, 361, 882 S.E.2d 858, 862–63 (2023). While the state court litigation was on remand, the General Assembly passed the Shield Statute in 2023 to facilitate SCDC obtaining lethal injection drugs. *See* 2023 S.C. Acts No. 16.

That law protects any entity that "manufactures," "compounds," or "supplies" the "drugs . . . utilized in the execution of a death sentence" from having its identity disclosed, as well as protecting the identity of any person who "participates in the planning or administration of the execution of a death sentence." S.C. Code Ann. § 24-3-580(A)(1). "[A]ny identifying information" about that entity "shall be confidential." *Id.* § 24-3-580(B). "[I]dentifying information" is a "broad[]" term that includes "any record or information that reveals a name, date of birth, social security number, personal identifying information, personal or business contact information, or professional qualifications." *Id.* § 24-3-580(A)(2). The General Assembly declared the Shield Statute "shall be broadly construed by the courts of this State so as to give effect to the General Assembly's intent to ensure the absolute confidentiality of the identifying information of any person or entity directly or indirectly involved in the planning or execution of a death sentence within this State." *Id.* § 24-3-580(I).

With the benefit of the Shield Statute, SCDC managed to obtain pentobarbital. After the S.C. Supreme Court held that electrocution and the firing squad were constitutional, *see Owens*, 443 S.C. 246, 904 S.E.2d 580, all three methods of execution are now available.

**D.      Death Row Inmates challenge the Shield Statute.**

After the S.C. Supreme Court's decision in July 2024 in *Owens*, the Court issued an execution notice for Owens. That set off the predictable flurry of last-minute litigation, including in the S.C. Supreme Court, over the sufficiency of Director Stirling's certification that all three methods of execution were available. Tracking the S.C. Supreme Court's "extreme" illustration of a more-than-sufficient explanation that the court "doubt[ed] there could be any legitimate legal basis on which to mount a challenge," *Owens*, 443 S.C. at 293, 904 S.E.2d at 605, the Director explained that SLED's Forensic Services Lab tested the pentobarbital that would be used if Owens elected lethal injection. That lab, he noted, is "an internationally accredited forensic laboratory . . . that . . . used widely accepted testing protocols and methodologies" with testing performed by "experienced, qualified, and duly authorized personnel." Certification ¶ 10, ECF No. 1-3. The testing "confirmed the concentration of the solution provided is consistent with the vial labeling of pentobarbital, 50 milligrams per milliliter, and acknowledged the substance's concentration in terms of its purity and stability." *Id.*

Despite this information from the Director's certification, the Shield Statute, and his own election, Owens demanded to know more about the pentobarbital. *See* Objection, ECF No. 1-5. He sought additional details about the drug's creation, the "Beyond Use Date," actual test results, and storage conditions, attempting to bolster his request with the same affidavit from the same expert on whom Death Row Inmates rely here.

The S.C. Supreme Court rejected Owens's arguments. The certification "adequately

explain[ed]" how the Director determined that the pentobarbital was sufficiently "poten[t], pur[e], and stab[le]" and provided Owens "sufficient detail" "to make an informed election." S.C. Supreme Court Order 1–2, ECF No. 1-7.

Having failed to convince the S.C. Supreme Court to require SCDC to disclose additional information, Death Row Inmates came to federal court. They assert four claims based on the Shield Statute: (1) an as-applied challenge; (2) a facial challenge; (3) an access-to-courts claim; and (4) a right-to-counsel claim.

Before anything else happened in this case, Owens sought to stay his execution. This Court found that Owens was unlikely to prevail on his as-applied procedural due process claim, so it declined to stay his execution. *See* Order, ECF No. 19. So did the Fourth Circuit. *See* Order, No. 24-3 (4th Cir. Sept. 20, 2024). And the Supreme Court. *See* Order, No. 24-5603 (U.S. Sept. 20, 2024).

Defendants now move to dismiss Death Row Inmates' Complaint.

## STANDARD OF REVIEW

Under Rule 12(b)(1), a court must dismiss a claim if the court lacks subject-matter jurisdiction over that claim. A motion to dismiss for lack of subject-matter jurisdiction raises the issue of whether a court has the "power to adjudicate cases or controversies." *United States v. Wilson*, 699 F.3d 789, 793 (4th Cir. 2012). Federal courts are courts of limited jurisdiction and "may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). Upon a challenge to subject-matter jurisdiction, the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of jurisdiction. *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual

allegations that state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). Although well-pleaded factual allegations must be accepted as true, the Court need not accept as true legal conclusions, unwarranted inferences, or arguments cast as factual allegations. *See id.*

## ARGUMENT

**I.    Due process does not entitle Death Row Inmates to additional information about lethal injection drugs and execution team members.**

Death Row Inmates' first claim is a familiar one, given that the preliminary injunction motion Owens filed focused on this claim. *See* ECF No. 5. They assert an as-applied challenge to the adequacy of the information that they are provided by the Director's certification of the available methods for an execution under section 24-3-530(B). *See* Compl. ¶¶ 33–43, ECF No. 1. This claim fails for two reasons.

### A.    Death Row Inmates are precluded from asserting this claim here.

Death Row Inmates explicitly base this claim on "the state supreme court's refusal" to provide additional information about lethal injection drugs. Compl. ¶¶ 37, 39, 43, ECF No. 1. What the S.C. Supreme Court has held is therefore crucial to understanding this claim and why it fails.

In its decision resolving a state-law method-of-execution challenge, the S.C. Supreme Court explained that the Director "must explain . . . the basis for his determination" that lethal injection is available. *Owens*, 443 S.C. at 292, 904 S.E.2d at 604. The S.C. Supreme Court gave an upper "extreme" example for how the Director might determine whether lethal injection is available:

> [I]f the Director certified in the affidavit that scientists at the Forensic Services Lab of the South Carolina Law Enforcement Division (SLED), whose experience and qualifications were verified by the Director and the Chief of SLED, recently performed testing according to widely accepted testing protocols and found the drugs were not only stable, but of a clearly acceptable degree of purity,

then we doubt there could be any legitimate legal basis on which to
mount a challenge.

*Id.* at 293, 904 S.E.2d at 605 (2024).

That's exactly how Director Stirling determined that lethal injection was available for
Owens's execution. *See* Certification ¶ 10, ECF No. 1-3. He explained that the "accredited" lab
used "widely accepted testing protocols" and "experienced, qualified, and duly authorized
personnel" to confirm the drug's "purity and stability." *Id.*

Despite the Director following the S.C. Supreme Court's illustration of a more-than-
sufficient explanation, Owens complained to that court that the Director's certification wasn't good
enough. He demanded to know the same information Death Row Inmates seek here, using the
same affidavit from the same expert on which Death Row Inmates now rely. *See* Almgren Aff.,
ECF No. 1-6 (with S.C. Supreme Court "Received" stamp). In lodging his objection, Owens
explicitly invoked due process as a basis for needing more information to "make an adequately
informed election." *See* Objection 1, 2, 4, ECF No. 1-5.

The S.C. Supreme Court disagreed that Owens was entitled to anything further. The
Director had "adequately explain[ed]" how he concluded that the pentobarbital was sufficiently
"poten[t], pur[e], and stab[le]," so Owens already had "sufficient detail" "to make an informed
election," S.C. Supreme Court Order 1–2, ECF No. 1-7—which was precisely what the S.C.
Supreme Court required the Director to do, *Owens*, 443 S.C. at 291, 904 S.E.2d at 604.

Death Row Inmates are precluded from relitigating in this Court what information a
certification must include. Collateral estoppel applies whenever an issue was "(1) actually litigated
in the prior action; (2) directly determined in the prior action; and (3) necessary to support the prior
judgment" *Carolina Renewal, Inc. v. S.C. Dep't of Transp.*, 684 S.E.2d 779, 782 (Ct. App. 2009).

First, due process was litigated in the S.C. Supreme Court. Owens raised it, *see* Objection

1, 2, 4, ECF No. 1-5, and the State responded on that issue, *see* Return 4–5, No. 2024-0013987 (S.C. Sept. 5, 2024).

Second, due process was directly decided. True, the S.C. Supreme Court may not have used the words "due process" in its order on Owens's objection. *See* S.C. Supreme Court Order, ECF No. 1-7. But the S.C. Supreme Court had already recognized that there was a "Due Process Clause component" involved in determining whether the certification is sufficient, *Owens*, 443 S.C. at 292, 904 S.E.2d at 604, so the court's decision not to discuss due process necessarily meant that the court did not see any due process problems with the Director's certification. If the certification did raise those concerns, the S.C. Supreme Court would have had to address it. *See* U.S. Const. art. VI, cl. 2.

Third, due process was necessary to the judgment. Without considering due process (even implicitly), the S.C. Supreme Court could not have denied Owens's objection.

That the remaining Death Row Inmates were not parties to that proceeding does not alter the analysis. South Carolina recognizes nonmutual collateral estoppel based on "[p]rinciples of finality, certainty, and the proper administration of justice." *Snavely v. AMISUB of S.C., Inc.*, 379 S.C. 386, 398, 665 S.E.2d 222, 228 (Ct. App. 2008). This case may present an unusual set of facts on the preclusion front, but the logic of the doctrine applies with full force. Owens had every incentive to litigate the question in the S.C. Supreme Court, and Death Row Inmates here consciously invoked Owens's fight in the S.C. Supreme Court as the basis for their claim here (and Owens in fact joined them in that effort). The State should not be required "to relitigate the identical question" in the federal courts. *Id.*; *cf.* Order 14–15 n.9, ECF No. 19 (*Rooker-Feldman* barred Owens from relitigating this claim). Allowing Death Row Inmates to relitigate the same issue and effectively appeal the state supreme court's order in federal court would only add to the

"[t]he seemingly endless proceedings that have characterized capital litigation" in recent decades. *Baze v. Rees*, 553 U.S. 35, 69 (2008) (Alito, J., concurring).

**B.      This claim fails on the merits.**

Even if Death Row Inmates were entitled to relitigate the question, they still lose. Procedural due process is "flexible," accounting for the facts of a case. *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005). What process is due in any situation considers the private interest involved, the risk of an erroneous deprivation, and the government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Death Row Inmates cannot meet any element of that test.

**1.      Death Row Inmates overread their statutory opportunity to elect a method of execution.**

South Carolina law gives a condemned inmate the opportunity to elect the firing squad or lethal injection, instead of electrocution, if those methods are available. *See* S.C. Code Ann. § 24-3-530(A). The S.C. Supreme Court called this "choice" an "innovation" because "a condemned inmate in South Carolina will never be subjected to execution by a method he contends is more inhumane than another method that is available." *Owens*, 443 S.C. at 298, 904 S.E.2d at 608.

Death Row Inmates ask this Court to stretch that statutory choice beyond what the S.C. General Assembly intended it to mean. *Cf. Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) (South Carolina's "cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature"). They cherry-pick quotes from the S.C. Supreme Court's recent methods-of-execution case about the Director having to explain the basis for his determination that lethal injection is available, *see* Compl. ¶ 38, ECF No. 1, but they ignore other parts of the state court's discussion. Most notably, the S.C. Supreme Court explained that, whatever the Director includes in his certification, the Director still "must comply with the confidentiality requirements of the shield statute." *Owens*, 443 S.C. at 291, 904 S.E.2d at 604. In other words, the right to

elect—and any accompanying entitlement to information—must be read in conjunction with the Shield Statute.

That's unsurprising. In South Carolina (as in most jurisdictions), "[s]tatutes dealing with the same subject matter must be reconciled, if possible, so as to render both operative." *Hodges*, 341 S.C. at 88, 533 S.E.2d at 583. This conclusion is buttressed by the fact that the S.C. General Assembly enacted the Shield Statute *after* amending the methods-of-execution statute that will allow Death Row Inmates to elect a method, and "[t]he more recent and specific legislation controls if there is a conflict between two statutes." *Id.* at 89 n.3, 533 S.E.2d at 583 n.3; *compare* 2023 S.C. Acts No. 16, *with* 2021 S.C. Acts No. 43.

Thus, as a matter of state law, Death Row Inmates will receive sufficient information to make their elections. *See* S.C. Supreme Court Order, ECF No. 1-7. As the S.C. Supreme Court acknowledged, that court "doubt[ed] there could be any legitimate legal basis on which to mount a challenge" if the Director's certification was based on testing by SLED. *Owens*, 443 S.C. at 293, 904 S.E.2d at 605.

Still, if Death Row Inmates were correct that federal law required that they receive more information than the Shield Statute permits, they would lose the right to elect. In amending the methods-of-execution statute, the General Assembly included a robust severability clause. *See* 2021 S.C. Acts No. 43, § 2. The later-enacted Shield Statute came only after the S.C. Supreme Court had remanded Owens's state court litigation earlier in 2023 for more discovery on why SCDC had been unable to obtain lethal injection drugs. *See Owens*, 438 S.C. at 361, 882 S.E.2d at 862–63. The Shield Statute seeks to protect the State from the "well-known phenomenon in which drug suppliers, once exposed to pressure from activists opposed to the death penalty, refuse to supply drugs to state corrections departments." *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 184

(4th Cir. 2019). Based on the legislature's aim to make—and keep—lethal injection available, severing the right to elect would be the only recourse if Death Row Inmates were right. It's not a consent protective order or limited disclosure. *Cf.* Compl. ¶ 56, ECF No. 1. The General Assembly made clear its "intent to ensure the *absolute* confidentiality of the identifying information of any person or entity directly or indirectly involved in the planning or execution of a death sentence." S.C. Code Ann. § 24-3-580(I) (emphasis added); *id.* § 24-3-580(C) (disclosing protected information is punishable by up to three years in prison).

This comports with this Court's conclusion on Owens's preliminary injunction motion that section 24-3-530 "gives [a condemned inmate] the right to choose his method of execution—period, not the right to discover what is, objectively, the best choice, nor the right to discover whether the execution methods are constitutional." Order 15, ECF No. 19 (footnote omitted).

### 2. Death Row Inmates offer only speculation about the pentobarbital.

Death Row Inmates look to Almgren's affidavit to support their claim for more information about lethal injection drugs, *see* Compl. ¶ 26, ECF No. 1, but she only hypothesizes about what could be true "if" certain conditions were met or what "may" happen if other things were true, Almgren Aff. ¶¶ 7, 8, ECF No. 1-6.

"[S]peculation" about a drug "cannot substitute for evidence" about it. *Brewer v. Landrigan*, 562 U.S. 996, 996 (2010); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level."). Courts have been consistent on this front. The Fifth Circuit, for example, once vacated a stay of an execution when an inmate had not received all the information he wanted about the pentobarbital that would be used, explaining that "the case might be different" only if a drug was "never before used or unheard of" and the "efficacy or science was completely unknown." *Sells v.*

*Livingston*, 561 F. App'x 342, 344 (5th Cir. 2014), *stay of execution denied by* 572 U.S. 1044 (2014). The Ninth Circuit recently refused to stay an execution based on "arguments about the provenance, quality, and reliability of the drug" that were "purely speculative." *Creech v. Tewalt*, 94 F.4th 859, 862–63 (9th Cir. 2024). And the list goes on. *See, e.g.*, *Zink v. Lombardi*, 783 F.3d 1089, 1103 (8th Cir. 2015) (en banc); *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1265–66 (11th Cir. 2014); *cf. Bucklew v. Precythe*, 587 U.S. 119, 144 (2019) (explaining why arguments based on "speculation" about lethal injection fail).

Although Death Row Inmates say they need more information, they only speculate that the requested information would change the election they will make. As the Director's certification for Owens's execution showed, SLED's "internationally accredited" lab "used widely accepted testing protocols and methodologies" and "experienced, qualified, and duly authorized personnel" to test the pentobarbital for its "purity and stability." Certification ¶ 10, ECF No. 1-3. Nothing Death Row Inmates allege casts any credible doubt on SLED's testing or suggests that an execution is likely to be botched (as Owens's recent execution demonstrated). *See Bucklew* 587 U.S. at 144 (speculation isn't enough). So, for instance, Death Row Inmates have not alleged that the transportation or storage of the drugs would likely change the results of the testing or their election. As just one more example, their demand for any applicable expiration or "Beyond Use" date implies that the Director would certify that lethal injection were available even if the pentobarbital would expire or no longer be usable before an execution date—something for which they have no plausible basis to allege. Death Row Inmates want more information so that their expert, rather than Director Stirling, can determine whether the drugs are sufficient for carrying out an execution. Yet that does not excuse Death Row Inmates from sufficiently alleging that more information is necessary for them to make the election that the General Assembly, through the exercise of

legislative grace, afforded them. To the contrary, far from satisfying their burden, Death Row Inmates' implausible implication and request for more information only underscore the conjectural nature of their claim. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("An injury in fact must be 'concrete,' meaning that it must be real and not abstract.").

In the same way, Death Row Inmates only speculate about the need for details about the qualifications of the execution team members who will insert the IV. That other States may have experienced difficulties in specific cases (often involving inmates with complicating medical conditions, such as an Alabama inmate with cancer in 2018 or an Arizona inmate with a degenerative spinal condition in 2022) does not mean that South Carolina will.[3]

### 3. South Carolina has a strong interest in protecting information about lethal injection drugs and execution team members.

South Carolina has a "significant interest in enforcing its criminal judgments," *Nelson*, 541 U.S. at 650, and its law generally, *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (State suffers "irreparable injury" "[a]ny time" its law is enjoined). To protect those interests, courts should not be "transformed . . . into boards of inquiry charged with determining 'best practices' for executions." *Baze*, 553 U.S. at 51 (plurality). Sanctioning that transformation would result in endless new "round[s] of litigation," "embroil the courts in ongoing scientific controversies beyond their expertise," and "substantially intrude on the role of state legislatures in implementing their execution procedures." *Id.* Yet that is what Death Row Inmates implicitly ask this Court to do. Rather than treat procedural due process as a floor to ensure basic protections (which they will receive from Director Stirling's certification), Death Row Inmates

---

[3] All this speculation carries even less weight after Owens's execution involved no reports of any issues.

demand at least six additional categories of information. The Court should decline the invitation to nudge open the door that the Supreme Court closed in *Baze*.

The State also has a strong interest in continuing to obtain lethal injection drugs for future executions. To that end, protecting the sources of these drugs is vital. "[D]isclosure of the supplier for a particular drug used by a state in executions will have predictable consequences: anti-death penalty advocates will hound the supplier of that drug until the supplier capitulates and ceases supplying the drug." *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1341 (11th Cir. 2020). Just as the Shield Statute was an important tool for making lethal injection available for Owens, it plays an equally critical role in maintaining this method as an option.

The risk of disclosure isn't hypothetical. Attempts to learn more about these drugs predictably come from death row inmates in South Carolina. But they also come from other sources. For instance, a death row inmate in Idaho, represented by a federal public defender, recently sent a subpoena to SCDC for information about its drugs and sources. *See generally Pizzuto v. Tewalt*, No. 1:21-cv-359 (D. Idaho). Examples abound in other States. *See, e.g.*, *Va. Dep't of Corr.*, 921 F.3d at 194 (attempt by Mississippi inmates to obtain Virginia information). No matter what steps are taken to protect information in discovery, there remains "the inherent danger and hardship that would follow even an *inadvertent* disclosure." *Jordan v. Hall*, No. 3:15-CV-295, 2018 WL 1546632, at *11 (S.D. Miss. Mar. 29, 2018) (emphasis added).

That other States may disclose additional or different information is immaterial here for at least three reasons. *First*, other States have had different experiences with lethal injection drugs than South Carolina has. The struggle that South Carolina has had compared to other States in obtaining drugs for lethal injection makes South Carolina understandably more intent on protecting its ability to secure those drugs moving forward.

*Second*, other States' previous approaches may not work now or here. Less than three months ago, NPR publicly identified Texas's drug supplier. *See* Chiara Eisner, *Unmarked Cars and Secret Orders: How a Pharmacy Prepared Drugs for Texas' Executions*, NPR (July 10, 2024), https://tinyurl.com/3ypzp2ek. And Utah just saw fit to adopt a more robust shield law. *See* Utah Code Ann. §§ 64-13-27(3)–(4) (enacted in 2024). What's more, these States' willingness to disclose more information does not protect them from the inevitable lawsuits that condemned inmates bring as their execution dates approach.

And *third*, all States do not need the same approach. The Supreme Court has "long recognized the role of the States as laboratories for devising solutions to difficult legal problems." *Oregon v. Ice*, 555 U.S. 160, 171 (2009) (citing *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)). Just because some States disclose different or additional information does not mean South Carolina must too. The Constitution does not require South Carolina to tally up what other States do, much less copy them. Ultimately, Death Row Inmates may disagree with South Carolina's Shield Statute, but South Carolina is where they chose to commit their crimes.

## II. The Shield Statute is constitutional.

Death Row Inmates proffer four facial attacks on the Shield Statute, but none has merit.

A few preliminary points on this claim: First, it is a facial challenge, so Death Row Inmates "can only succeed" if they "establish[] that no set of circumstances exists under which the [Shield Statute] would be valid." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). This is therefore "the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Second, legislatures—not courts—set policy, and courts cannot overrule legislative policy

judgments short of a constitutional flaw. *E.g.*, *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 345 (2017) (a court "cannot overrule Congress's judgment based on [the court's] own policy views"); *Richland Cnty. Sch. Dist. 2 v. Lucas*, 434 S.C. 299, 306–07, 862 S.E.2d 920, 924 (2021) (a court may "not sit as a superlegislature to second guess the wisdom or folly of decisions of the General Assembly").

Third, allegations must be "plausible" to survive a motion to dismiss. *Twombly*, 550 U.S. at 570. Speculation about lethal injection drugs won't suffice. *E.g.*, *Brewer*, 562 U.S. 996 (vacating stay of execution); *see also Food & Drug Admin.*, 602 U.S. at 381 (injury-in-fact requirement).

### A.  Death Row Inmates are not entitled to information about manufacturing or compounding.

Death Row Inmates start by demanding to know the "manufacturing or compounding process" for the pentobarbital. Compl. ¶ 47, ECF No. 1. They acknowledge that the Shield Statute protects that information. *See* S.C. Code Ann. §§ 24-3-580(A)(1), (A)(2), and (B). Yet they insist that, based "[o]n information and belief," they must know the qualifications of a manufacturer or compounder to know "whether there is a risk those drugs will lack the potency, purity, and stability needed to bring about death without inflicting serious pain." Compl. ¶ 47, ECF No. 1.

Two things stand out about this assertion. One, it is speculative. They do not offer any plausible allegation that SCDC faces any such issues with an "unqualified or unreliable" manufacturer or a "compounding process [that] is not followed properly." *Id.* Such bald assertions don't come close to *Twombly*'s plausibility standard, and they are exactly the type that courts have consistently rejected. *See, e.g.*, *Creech*, 94 F.4th at 862–63 ("Creech's other arguments about the provenance, quality, and reliability of the drug are purely speculative and are based on unauthenticated exhibits submitted with his motion and the conjecture of his expert."); *Zink*, 783 F.3d At 1102–03 ("the prisoners' complaint contains no more than speculative and hypothetical

generalized assertions about the nature of compounding pharmacies"); *cf. Food & Drug Admin.*, 602 U.S. at 381 (injury-in-fact requirement).

Two, this assertion completely discounts the State's interest in protecting its source of lethal injection drugs. Courts have repeatedly acknowledged that if these sources are disclosed, they typically stop selling to departments of corrections. *See, e.g.*, *Jordan*, 947 F.3d at 1341 ("predictable consequences"); *Va. Dep't of Corr. v. Jordan*, 921 F.3d at 184 ("well-known phenomenon"). Condemned inmates should not be permitted to take state officials a bit further each time to see how much information they can receive before the supplier is disclosed, which can happen either inadvertently (despite protections against it), *see Jordan*, 2018 WL 1546632, at *11, or through deliberate investigation, *see* Eisner, *supra* (disclosing Texas's supplier).

**B.** **Death Row Inmates are not entitled to information about execution team members' qualifications.**

Death Row Inmates make a similar demand for information about the execution team members' qualifications, pointing specifically to issues that other States have experienced with inserting IV lines. *See* Compl. ¶ 48, ECF No. 1.

As with their first argument on this claim, Death Row Inmates face two problems here. The first is (again) speculation. *See Food & Drug Admin.*, 602 U.S. at 381 (injury-in-fact requirement). They point to no record of such problems in South Carolina, and they ignore that these instances of problems with IV lines often involve condemned inmates with complicating medical conditions. *See* Death Penalty Information Center, *Botched Executions*, https://tinyurl.com/yc3ddx4t (last visited Sept. 24, 2024) (*e.g.*, Hamm, 2018, Alabama: suffering from cancer; Atwood, 2022 Arizona: degenerative spinal condition).

The second is that Death Row Inmates ignore what SCDC said publicly before the Shield Statute was enacted. In a case brought by another condemned inmate, SCDC's former director of

the Division of Operations submitted an affidavit about the qualifications of team members in that inmate's execution. The policy for execution procedures that he attached to his affidavit stated that the EMT or PA who inserted the IV must be certified for at least one year and have "experience in siting and inserting IV lines." Aff. of Robert Ward, Ex. A, at § 17.3, *Williams v. Ozmint*, No. 3:08-cv-655 (D.S.C. Feb. 10, 2009), ECF No. 112-1.

### C. The Shield Statute permissibly exempts the purchase of drugs from the procurement code and other licensing requirements.

Death Row Inmates also challenge the Shield Statute's exemption from regulatory and licensing requirements, asserting that these exemptions remove necessary safeguards. *See* Compl. ¶¶ 49–50, ECF No. 1.

Once again, the cornerstone of this claim is speculation. If Death Row Inmates had any facts they could allege to support this claim, they would have more than "[o]n information and belief" and theory. *Id.* ¶ 50. Just as their prior speculative assertions cannot survive a motion to dismiss, neither can this one. *See Food & Drug Admin.*, 602 U.S. at 381 (injury-in-fact requirement).

Plus, Death Row Inmates' argument here is undermined by SCDC's testing of execution drugs. The S.C. Supreme Court pointed to testing by SLED as the upper "extreme" example of how the Director could "explain in the affidavit how he determined the drugs were of sufficient 'potency, purity, and stability' to carry out their intended purpose." *Owens*, 443 S.C. at 293, 904 S.E.2d at 605. That's exactly what Director Stirling did in Owens's case, and this testing minimizes (or even eliminates) any "risks of insufficient potency, contamination, or [the substance] being an entirely difference substance than indicated on the label." Compl. ¶ 50, ECF No. 1.

**D. Death Row Inmates are not entitled to information about compliance with federal regulations.**

Death Row Inmates' final facial challenge involves the requirement that SCDC comply with federal regulations on importing drugs. *See* Compl. ¶ 51, ECF No. 1. In essence, they complain that the Shield Statute keeps them from "determin[ing] whether federal compliance has actually occurred." *Id.*

But this assumes that Death Row Inmates have a right to enforce this provision. They do not. A person has a private right of action under a South Carolina statute only if the General Assembly intends to create such a right. *See Georgetown Cty. League of Women Voters v. Smith Land Co.*, 393 S.C. 350, 353, 713 S.E.2d 287, 289 (2011). When the General Assembly does not expressly create a private right of action, an implied right exists only "if the legislation was enacted for the special benefit of the private party." *Dema v. Tenet Physician Servs.-Hilton Head, Inc.*, 383 S.C. 115, 121, 678 S.E.2d 430, 433 (2009). By contrast, "[i]f the overall purpose of the statute is to aid society and the public in general, the statute is not enacted for the special benefit of a private party," and there is no private right of action. *Id.*

The Shield Statute was not enacted for the benefit of Death Row Inmates. It is for the benefit of the State and victims. *Cf. Bucklew*, 587 U.S. at 149 ("The people of [South Carolina], the surviving victims of [Death Row Inmates'] crimes, and others like them deserve better" than additional delay).

Still, even if Death Row Inmates could sue to enforce this provision, Death Row Inmates' claim suffers from the same flaw as the other aspects of their facial challenge: It is based on pure speculation. They include no allegation (much less a plausible one) that SCDC has violated, is violating, or would violate federal regulations.

\*      \*      \*

At bottom, Death Row Inmates' facial challenge appears to be a fishing expedition for information about lethal injection drugs. But as explained on their next claim, *see infra* Part III, federal law recognizes no such due process right to "discover grievances," *Lewis*, 518 U.S. at 354 (emphasis omitted). They complain that lethal injections can be botched,[4] but multiple Death Row Inmates admitted in the state court litigation that a single dose of pentobarbital is "the most reliable and humane way to conduct a lethal injection." R. p. 113, No. 2022-001280 (S.C. Oct. 27, 2022). Plus, reciting rank speculation about the risk of botched executions is not a substitute for a legal standard in execution-related lawsuits. *See, e.g.*, *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017); *cf. Louisiana v. Resweber*, 329 U.S. 459, 462 (1947) ("Accidents happen for which no man is to blame."). This is especially true on a facial challenge when a plaintiff must show "no set of circumstances exists under which the [law] would be valid." *Wash. State Grange*, 552 U.S. at 449.

## III. Death Row Inmates have not been denied access to the courts.

Death Row Inmates' third claim alleges that their inability to obtain the additional information they seek precludes them from asserting an Eighth Amendment challenge in court, which violates the First and Fourteenth Amendments. *See* Compl. ¶¶ 59–69, ECF No. 1.

Death Row Inmates point to *Lewis v. Casey* for the proposition that they must have "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." Compl. ¶ 64, ECF No. 1 (quoting 518 U.S. at 351). The *Lewis* Court recognized that inmates have a right to bring their claims, but the Court also "disclaim[ed]" any suggestion that a "State must enable the prisoner to *discover* grievances, and to *litigate effectively* once in

---

[4] If Death Row Inmates are that worried about botched lethal injections, South Carolina law allows them to elect the firing squad, which the source they cite says has a botched rate of 0%. *See* Austin Sarat, *Gruesome Spectacles* 177 (2014) (providing a chart of "Botched execution rate[s]" for 1900–2010, with a rate of 1.92% for electrocution, 0.0% for firing squad, and 7.12% for lethal injection) (cited at Compl. ¶ 55 n.4, ECF No. 1).

court." 518 U.S. at 354 (emphasis in original).

Given this disclaimer, it's no surprise that federal courts have consistently rejected claims like this one. Condemned inmates in Arkansas challenged that State's refusal to disclose certain information as violating "their due process right to access the courts." *Williams v. Hobbs*, 658 F.3d 842, 851 (8th Cir. 2011). The Eighth Circuit affirmed the dismissal of that claim. In doing so, the court observed that a "right of access to the courts" differs from a right "to discover grievances." *Id.* at 851–52 (second quotation quoting *Lewis*, 518 U.S. at 354). Being unable to discover information did not preclude the inmates from "physically" filing a claim. *Id.* at 852.

The en banc Eighth Circuit reaffirmed this position a few years later. "State prisoners have a constitutional 'right of access to the courts,' but this right does not guarantee the ability 'to *discover* grievances, and to *litigate effectively* once in court.'" *Zink*, 783 F.3d at 1108 (quoting *Lewis*, 518 U.S. at 350, 354). The inmates' "claim that they are unable to discover information regarding the execution protocol is thus insufficient as a matter of law to state a due process claim." *Id.*

Look next to the Eleventh Circuit. A Georgia death row inmate challenged that State's shield law, insisting that he had a right to know more about how he would be executed. *Wellons*, 754 F.3d at 1262. But the appellate court held that "[n]either the Fifth, Fourteenth, or First Amendments afford Wellons the broad right to know where, how, and by whom the lethal injection drugs will be manufactured, as well as the qualifications of the person or persons who will manufacture the drugs, and who will place the catheters." *Id.* at 1267 (cleaned up). The Eleventh Circuit cited the Supreme Court's disclaimer of the suggestion that a prisoner has a right to "discover grievances" in reaching this conclusion. *Id.* (citing *Lewis*, 518 U.S. at 354).

The Eleventh Circuit stood by this conclusion when another inmate challenged it a few

years later, raising a "free-standing due process claim for discovery, untethered to any other claim currently in litigation." *Jones v. Comm'r, Ga. Dep't of Corr.*, 812 F.3d 923 (11th Cir. 2016) (Marcus, J., concurring in denial of initial hearing en banc). Again, the court looked to *Lewis* for the proposition "that there is no due process right to discover grievances, and to litigate effectively once in court,'" which made the inmate's "freestanding due process challenge to Georgia's secrecy statute . . . unmeritorious." *Id.* at 924–25 (quoting *Lewis*, 518 U.S. at 354)); *see also Terrell v. Bryson*, 807 F.3d 1276, 1277 (11th Cir. 2015) (per curiam) (death row inmate "has not demonstrated a due process right to the information that Georgia law keeps secret").

Other circuits are in accord. The Sixth Circuit, pointing to the same language from *Lewis*, quickly disposed of a due process claim for more information: "no constitutional right exists to discover grievances or to litigate effectively once in court." *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016). And the Fifth Circuit rejected a due process theory based on Louisiana's refusal to disclose the "details of its execution protocol." *Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013).

When a few courts have thought that due process required a State to disclose more information to death row inmates, the Supreme Court has swiftly reversed. The Ninth Circuit, for example, stayed an Arizona inmate's execution after the State withheld information about the drugs for his execution, reasoning that the inmate likely had a First Amendment right to that information. *Wood v. Ryan*, 759 F.3d 1076, 1079 (9th Cir. 2014). The Supreme Court summarily vacated the stay. *Ryan v. Wood*, 573 U.S. 976 (2014). Similarly, the District of Maryland—despite "locat[ing] no cases specifically establishing a right of production"—stayed an inmate's execution because it presupposed "[f]undamental fairness, if not due process, requires that the execution protocol that will regulate an inmate's death be forwarded to him in prompt and timely fashion."

*Oken v. Sizer*, 321 F. Supp. 2d 658, 664 (D. Md. 2004). Again, the Supreme Court summarily vacated the stay. *Sizer v. Oken*, 542 U.S. 916 (2004).

Even if they didn't face this overwhelming caselaw, Death Row Inmates cannot offer any credible argument for breaking with the holdings of these other courts based on first principles. In the first place, the "right" is "access to the courts." *Lewis*, 518 U.S. at 350 (emphasis omitted). The "right" is not "to discover" information. *Id.* at 354 (emphasis omitted). In fact, "[a]s a general rule, citizens have no first amendment right of access to traditionally nonpublic government information." *McGehee v. Casey*, 718 F.2d 1137, 1147 (D.C. Cir. 1983) (collecting Supreme Court cases)). That is why governments enacted FOIAs. *See, e.g.*, 5 U.S.C. § 552; S.C. Code Ann. §§ 30-4-10 *et seq.*; *cf.* S.C. Code Ann. § 30-4-30(A)(1) (inmates may not send FOIA requests). Death Row Inmates would have the Court disregard all this law and break new ground to fashion a due process right to government information that a plaintiff claims is necessary to bring a lawsuit.

And in the second, Death Row Inmates' argument would fundamentally upend our judicial system. A plaintiff must have an actual injury caused by a defendant that a court can remedy. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To have a claim progress past the initial stages, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. If a plaintiff does that, he can proceed with discovery. *See* Fed. R. Civ. P. 26. Accepting Death Row Inmates' theory here would flip this well-established process on its head and adopt "the novel idea that the law will (or should) allow discovery first, and only then require [a plaintiff] to meet the standards prescribed by the Supreme Court." *Jones*, 812 F.3d at 925. Such a flip would subject the courts to a flood of litigation from plaintiffs (including inmates) who would sue first to learn what their claims were.

## IV. Death Row Inmates have not been denied their right to counsel.

Death Row Inmates' final claim is that the Shield Statute "constructively denie[s] . . . their statutory right to the assistance of counsel." Compl. ¶ 73, ECF No. 1. In short, they claim that their lawyers cannot obtain "the information needed to make a fully informed decision about [Death Row Inmates'] chosen method of execution." *Id.*

Death Row Inmates are statutorily entitled to appointed counsel if they cannot afford an attorney through every stage of litigation. *See* 18 U.S.C. § 3599(a). Death Row Inmates seek to take this statutory gift from Congress and transmogrify it into an end-around to obtain information that they themselves are not entitled to. They cannot use their lawyers' representation to obtain what they cannot because an agent cannot have greater authority than a principal. *See Hyams v. Carroll*, 146 S.C. 470, 475, 144 S.E. 153, 154 (1928) ("certainly its agent could not enjoy greater powers than the principal"). In other words, Death Row Inmates cannot use the backdoor just because the front door is closed. *Cf. Just. 360 v. Stirling*, 42 F.4th 450, 452 (4th Cir. 2022) (lawyers lacked standing to sue for SCDC's execution protocol on a theory that not receiving it "violates [their] First Amendment right to counsel clients").

## V. SCDC enjoys Eleventh Amendment immunity.

The Supreme Court "has drawn upon principles of sovereign immunity to construe the [Eleventh] Amendment to establish that 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990). This immunity extends to "state instrumentalities." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

This Court has consistently held that SCDC is an instrumentality of the State. *See, e.g., Brown v. SC Dep't of Corr.*, No. 8:20-CV-01159-TMC-JDA, 2020 WL 3001787, at *3 (D.S.C.

May 15, 2020), *report and recommendation adopted*, No. 8:20-CV-1159-TMC, 2020 WL 2994234 (D.S.C. June 4, 2020); *Gary v. S.C. Dep't of Corr.*, No. CA 8:12-2915-MBS-JDA, 2012 WL 5554098, at *1 (D.S.C. Oct. 23, 2012), *report and recommendation adopted*, No. CA 8:12-2915-MBS, 2012 WL 5553293 (D.S.C. Nov. 15, 2012). *Ex parte Young*, of course, cannot help Death Row Inmates here, as that fiction applies only to injunctive relief against an "officer" whose official duties include carrying out the challenged law. 209 U.S. 123, 157 (1908). SCDC is not an officer; it's an agency. Thus, at the very least, SCDC should be dismissed.

## CONCLUSION

The Court should grant the Motion to Dismiss.

Respectfully Submitted,

s/Wm. Grayson Lambert
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Senior Litigation Counsel*
Erica W. Shedd (Fed. Bar No. 13206)
*Deputy Legal Counsel*
Tyra S. McBride (Fed. Bar No. 13324)
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
eshedd@governor.sc.gov
tmcbride@governor.sc.gov

*Counsel for Governor McMaster*

*and*

s/Daniel C. Plyler
Daniel C. Plyler (Fed. Bar No. 9762)
Austin T. Reed (Fed. Bar No. 13405)
SMITH │ ROBINSON
2530 Devine Street
Columbia, SC 29205
(803) 254-5445
Daniel.Plyler@SmithRobinsonLaw.com
Austin.Reed@SmithRobinsonLaw.com

*Counsel for Bryan P. Stirling and
the South Carolina Department of Corrections*

September 27, 2024