IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Steven V. Bixby; Marion Bowman, Jr.; Mikal D. Mahdi; Richard Bernard Moore; Freddie Eugene Owens; Brad Keith Sigmon, | ) ) ) ) ) | Case No. 3:24-cv-05072-JDA |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **OPINION AND ORDER** |
| Bryan P. Stirling, *in his official capacity as the Director of the South Carolina Department of Corrections*; South Carolina Department of Corrections, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| v. | ) ) ) | |
| Governor Henry Dargan McMaster, | ) ) | |
| Intervenor. | ) ) | |

This matter is before the Court on a motion to dismiss filed by Defendants Bryan P. Stirling and the South Carolina Department of Corrections ("SCDC") (collectively, "Defendants") and Intervenor Governor Henry McMaster (collectively, the "Moving Parties"). [Doc. 25.] Plaintiffs are all prisoners incarcerated under SCDC's control and supervision who have been sentenced to death, and they filed this action under 42 U.S.C. § 1983 alleging that they have a constitutional right to particular information about the drugs SCDC has obtained for purposes of carrying out their deaths by lethal injection and that South Carolina's statute prohibiting the dissemination of certain information regarding the lethal injection process is unconstitutional. [Doc. 1.]

On September 27, 2024, the Moving Parties filed their motion to dismiss.  [Doc. 25.]  Plaintiffs filed a response in opposition on October 11, 2024, and the Moving Parties filed a reply on October 17, 2024.  [Docs. 27; 28.]  The motion is ripe for review.

## BACKGROUND

**The Complaint's Factual Allegations and the Litigation Concerning South Carolina's Death Penalty Statute**

In 2021, the South Carolina Legislature (the "Legislature") amended South Carolina's death penalty statute (the "Death Penalty Statute" or the "Statute") to make electrocution the default method of execution but permitting the person sentenced to death to also choose "firing squad or lethal injection, if it is available at the time of election."  S.C. Code § 24-3-530(A).  South Carolina law further provides that, upon receiving a notice of execution, SCDC's director (the "Director") must "determine and certify by affidavit under penalty of perjury to the Supreme Court whether the methods [of execution] provided" by the Death Penalty Statute—electrocution, firing squad, and lethal injection—"are available."  *Id.* § 24-3-530(B).

Plaintiffs allege that from 1995 until 2021, lethal injection had been the primary means of execution in South Carolina but that South Carolina has not actually carried out executions since 2011, due in part to the reluctance of drug manufacturers and suppliers to provide drugs for executions in a manner that might publicly reveal their identities. [Doc. 1 ¶¶ 7–8.]  In 2023, the Legislature enacted legislation amending an existing statute to provide protection from disclosure to drug suppliers and all other persons or entities associated with the "planning or administration" of an execution.  [*Id.* ¶ 12]; 2023 S.C. Laws Act 16.  As amended, the statute (the "Shield Statute") exempts the purchase of lethal injection drugs from South Carolina's procurement rules, Department of Health and

2

Environmental Control regulations, and pharmacy guidelines.  [Doc. 1 ¶ 12]; S.C. Code § 24-3-580.[1]  With the Shield Statute in place, Stirling was able to acquire—from an

---

[1] The Shield Statute provides:

> (A) As used in this section, the term:
>
> > (1) "Execution team" shall be construed broadly to include any person or entity that participates in the planning or administration of the execution of a death sentence, including any person or entity that prescribes, compounds, tests, uses, manufactures, imports, transports, distributes, supplies, prepares, or administers the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence.
> >
> > (2) "Identifying information" shall be construed broadly to include any record or information that reveals a name, date of birth, social security number, personal identifying information, personal or business contact information, or professional qualifications. The term "identifying information" also includes any residential or business address; any residential, personal, or business telephone number; any residential, personal, or business facsimile number; any residential, personal, or business email address; and any residential, personal, or business social media account or username.
> >
> > (3) "De-identified condition" means data, records, or information from which identifying information is omitted or has been removed.
>
> (B) Notwithstanding any other provision of law, any identifying information of a person or entity that participates in the planning or administration of the execution of a death sentence shall be confidential. For all members of the execution team, identifying information shall not be subject to discovery, subpoena, or any other means of legal compulsion or process for disclosure to any person or entity in any

administrative, civil, or criminal proceeding in the courts, administrative agencies, boards, commissions, legislative bodies, or quasilegislative bodies of this State, or in any other similar body that exercises any part of the sovereignty of the State.

(C) A person shall not knowingly disclose the identifying information of a current or former member of an execution team or disclose a record that would identify a person as being a current or former member of an execution team. Any person and his immediate family, or entity whose identity is disclosed in violation of this section shall have a civil cause of action against the person who is in violation of this section and may recover actual damages and, upon a showing of a wilful violation of this section, punitive damages. A person who violates the provisions of this subsection also must be imprisoned not more than three years.

(D) Any purchase or acquisition of drugs, medical supplies, and medical equipment necessary to execute a death sentence shall be exempt from the entirety of the South Carolina Procurement Code and all of its attendant regulations.

(E) The out-of-state acquisition of any drug intended for use by the department in the administration of the death penalty shall be exempt from all licensing processes and requirements administered by the Department of Health and Environmental Control or by any other department or agency of the State of South Carolina. Furthermore, the out-of-state acquisition of any drug intended for use by the department in the administration of the death penalty shall be exempt from all regulations promulgated by the Board of Pharmacy.

(F) Any pharmacy or pharmacist, whether located within or without the State, that is involved in the supplying, manufacturing, or compounding of any drug intended for use by the department in the administration of the death penalty shall be exempt from all licensing, dispensing, and

4

possession laws, processes, regulations, and requirements of or administered by the Department of Labor, Licensing and Regulation, the Board of Pharmacy, or any other state agency or entity, found anywhere in the South Carolina Code of Laws or South Carolina Code of Regulations, only to the extent that the licensing, dispensing, and possession laws, processes, regulations, and requirements pertain to the drugs intended for use in the administration of the death penalty, and no prescription from any physician shall be required for any pharmacy or pharmacist to supply, manufacture, or compound any drug intended for use in the administration of the death penalty. This exemption shall not apply to any licensure or permitting requirements for the supply, manufacture, or compounding of any other legend drug or pharmaceutical device.

(G) Notwithstanding any other provision of law, including the South Carolina Freedom of Information Act, Section 30-4-10, et seq., no department or agency of this State, no political subdivision, and no other government or quasigovernment entity shall disclose the identifying information of any member of an execution team or any details regarding the procurement and administrative processes referenced in subsections (D) through (F).

(H) The Office of the Comptroller General and the Office of the State Treasurer shall work with the South Carolina Department of Corrections to develop a means to ensure that the state's accounting and financial records related to any transaction for the purchase, delivery, invoicing, etc. of or for supplies, compounds, drugs, medical supplies, or medical equipment utilized in the execution of a death sentence are kept in a de-identified condition.

(I) This section shall be broadly construed by the courts of this State so as to give effect to the General Assembly's intent to ensure the absolute confidentiality of the identifying information of any person or entity directly or indirectly

unidentified source—the drugs needed to carry out lethal injection executions, and he so informed the state supreme court in September 2023.  [Doc. 1 ¶ 14.]

Two of the Plaintiffs currently involved with this case were among those who recently litigated a lawsuit alleging that the Death Penalty Statute violates the state constitution in several respects.  *See Owens v. Stirling*, 904 S.E.2d 580 (S.C. 2024) ("*Owens*").  On July 31, 2024, the state supreme court issued a decision in that case holding that the Death Penalty Statute is not impermissibly retroactive; that neither death by electrocution, death by firing squad, nor the provision allowing the condemned to choose his execution method violates the South Carolina constitutional mandate "nor shall cruel, nor corporal, nor unusual punishment be inflicted"; that the term "available" in the Statute allowing inmates to elect either firing squad or lethal injection as an alternative to electrocution "if available," is not unconstitutionally vague; and that the provision requiring the Director to determine the drug protocol to use to carry out the death sentence by lethal injection does not violate separation of powers.  *Id.*  Regarding the

---

involved in the planning or execution of a death sentence within this State.

(J) The Department of Corrections shall comply with federal regulations regarding the importation of any execution drugs.

(K) A member of the General Assembly, a member's immediate family, or any business with which a member or the member's immediate family member has a controlling interest as an owner, director, officer or majority shareholder that has voting rights regarding the business' financial decisions must not offer nor provide drugs, medical supplies, or medical equipment necessary to execute a death sentence.

S.C. Code § 24-3-580.

6

constitutionality of the provision allowing condemned inmates to choose among the different execution methods, the court emphasized that the provision represented "the General Assembly's sincere effort to make the death penalty less inhumane while enabling the State to carry out its laws." *Id.* at 608. The court also held that the provision requiring the Director to "determine and certify by affidavit . . . whether the methods . . . are available" mandates that if the Director is able to obtain the necessary drugs, he "must explain to those legally entitled to the explanation the basis of his determination that the drugs are of sufficient 'potency, purity, and stability' to carry out their intended purpose," which "requires nothing more than that the Director set forth that process in sufficient detail that a condemned inmate and his attorneys may understand whether there is a basis for challenging the constitutionality of the impending execution." *Id.* at 604–05.

After issuing *Owens*, on August 23, 2024, the state supreme court issued an execution notice directing SCDC to set Owens's execution for September 20, 2024.[2] [Docs. 1 ¶ 17; 1-2.] Five days later, Stirling submitted a certification to that court, pursuant to S.C. Code § 24-3-530(B), stating, among other things, that SCDC had obtained pentobarbital for use in a lethal injection; that the pentobarbital is of sufficient potency, purity, and stability to carry out an execution successfully; and that the forensic laboratory of the South Carolina Law Enforcement Division ("SLED") had tested and approved the pentobarbital. [Docs. 1 ¶¶ 18, 19; 1-3.]

---

[2] On August 30, 2024, the state supreme court issued an order establishing a regular interval of at least 35 days between the issuance of death notices and determined that after the issuance of Owens's death notice, the court would issue notices for inmates with exhausted appeals in the following order: (1) Richard Moore, (2) Marion Bowman, Jr., (3) Brad Sigmon, (4) Mikal Mahdi, (5) Steven Bixby. [Docs. 1 ¶ 20; 1-4.]

Owens subsequently filed an objection in the state supreme court to Stirling's certification, asserting that his affidavit was insufficient both under South Carolina statutory law and the Due Process Clause of the federal Constitution. [Doc. 1-5.] Owens requested additional information about the testing and properties of the execution drugs SCDC had obtained (the "Additional Information"). [*Id.*; *see* Doc. 1 ¶¶ 22, 24, 26.] Specifically, he argued that the affidavit did not provide information about the date the drugs were tested; their Beyond Use Date or expiration date; the methods and procedures used to test the drugs, including documentation of test method validation and details of quality control procedures and methodology; the actual results of the testing; and where the drugs were to be stored prior to their use and how the storage considerations would be monitored, including temperature and humidity controls. [Doc. 1-5.] Accordingly, Owens requested that the Director provide "the actual report and results from the testing of the lethal injection drugs intended for use in [Owens's] execution (with the identity of the analyst redacted) and documentation of the drugs' beyond use date and storage conditions." [*Id.* at 5.] To his objection, Owens attached an affidavit from Dr. Michaela Almgren, Pharm.D., M.S., explaining why Owens needed the Additional Information to make an informed decision as to which execution method would pose the least risk of harm. [Docs. 1 ¶ 24; 1-6.] On September 5, the state supreme court overruled Owens's objection and denied his request, ruling that Stirling had provided all the information that the Death Penalty Statute required. [Docs. 1 ¶ 22; 1-7.] On September 6, 14 days before his execution date, Owens made his election regarding the method of execution, choosing death by lethal injection. [Doc. 1-8]; *see* S.C. Code § 24-3-530(A) (providing that the

election "must be made in writing fourteen days before each execution date or it is waived").

**Plaintiffs' Claims and Remedies Sought**

On September 13, 2024, Plaintiffs brought the present action under 42 U.S.C. § 1983. [Doc. 1.] Plaintiffs allege that the Shield Statute, on its face, does not restrict access to the Additional Information. [*Id*. ¶ 25.] Plaintiffs also allege that the need for sufficient information about the integrity of the lethal injection drugs is heightened because of the circumstances under which they were obtained, namely, that Stirling admitted to making over 1,300 contacts before he was successful in obtaining pentobarbital. [*Id*. ¶ 27.] Plaintiffs contend that the difficulty Defendants faced in acquiring the drugs from standard sources raises legitimate questions about the quality of the materials they eventually obtained. [*Id*.] Additionally, they maintain that the need for information concerning the drugs is greater due to the absolute restrictions the Shield Statute places on disclosure of information relating to the source of the drugs and the circumstances surrounding their creation, and due to the exemptions from licensing and regulatory requirements that the Shield Statute grants to those involved in manufacturing and procuring the drugs. [*Id*. ¶ 28.] Plaintiffs complain that they are also unable to obtain information regarding the "professional qualifications" of the people who will set up, prepare, and administer the lethal injection process. [*Id*. ¶ 30 (internal quotation marks omitted).] Consequently, Plaintiffs claim they "cannot make an informed choice about their method of execution in the absence of information about whether the lethal injection team is appropriately trained and qualified." [*Id*. ¶ 31.]

Plaintiffs further contend the Shield Statute requires SCDC to "comply with federal regulations regarding the importation of any execution drugs," yet the Shield Statute prevents Plaintiffs, or any member of the public, or even South Carolina officials outside of SCDC, from knowing whether federal compliance is taking place. [*Id*. ¶ 32 (internal quotation marks omitted).] Thus, Plaintiffs contend the Shield Statute creates a federal compliance requirement but arbitrarily prohibits any mechanism for ensuring that compliance is happening. [*Id*.]

Plaintiffs' Complaint purports to assert four claims. Plaintiffs first allege that South Carolina's death penalty laws, as applied to them, deprive them of their rights to due process under the Fourteenth Amendment to the United States Constitution and Article I, Section 3 of the South Carolina Constitution. [*Id*. ¶¶ 33–43.] Plaintiffs allege that South Carolina's refusal to provide them with the Additional Information deprives them, without due process, of their "state-created rights to information and to choose their method of execution." [*Id*. ¶¶ 38–39.] They also allege a constitutional liberty interest in being free from cruel and unusual punishment that causes needless suffering and claim that without the Additional Information, they cannot determine whether there is a basis for challenging the constitutionality of the lethal injection option, nor could they meaningfully litigate any such claim. [*Id*. ¶ 37.]

Second, Plaintiffs allege a facial procedural due process claim, asserted under both the federal and state constitutions regarding the Shield Statute. [*Id.* ¶¶ 44–58.] Plaintiffs allege that the Shield Statute deprives condemned inmates of their state-created right to certain information about execution drugs and to choose a method of execution that is less inhumane than other options. [*Id.*] They also allege that the Shield Statute

prevents them from being able to verify the State's compliance with federal regulations regarding the importation of lethal injection drugs and increases the danger of a botched execution by exempting the execution process form a number of regulatory and licensing safeguards. [*Id.* ¶¶ 46, 49.] Third, Plaintiffs allege that depriving them of the Additional Information and the information protected by the Shield Statute violates their right to access the courts under the federal and state constitutions by depriving them of information necessary to litigate an Eighth Amendment claim, and finally, that it infringes on their right to assistance of counsel as well. [*Id.* ¶¶ 59–73.]

Plaintiffs ask this Court to grant a preliminary and ultimately permanent injunction prohibiting Defendants from carrying out Plaintiffs' executions without providing the Additional Information at least 23 days before the dates of their scheduled executions; a preliminary and permanent injunction prohibiting Plaintiffs' executions until Defendants have complied with applicable licensing and regulatory requirements; a declaration, pursuant to 28 U.S.C. § 2201, that Plaintiffs' constitutional and statutory rights have been violated; and any other relief the Court deems just and proper. [*Id*. ¶ 74.]

**Events That Have Occurred Since Plaintiffs Filed Their Complaint**

On September 13, 2024, the same day that Plaintiffs filed their Complaint, Owens filed a motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, asking the Court to preliminarily enjoin his execution so that he would not be executed before Plaintiffs' constitutional claims could be adjudicated. [Doc. 5.] He contended that, without the Additional Information, it would be impossible for Plaintiffs "to meaningfully exercise their state-conferred right to choose the method of execution they consider least inhumane, or to plausibly assess whether South Carolina's procedures for imposing death

by lethal injection will pose an unconstitutional risk of cruel and unusual punishment." [*Id*. at 1.]  Owens argued that he satisfied the criteria for issuance of a preliminary injunction because of "his clear right under state law to reasonable information; his tailored request for information, much of which is not even barred from disclosure by [the Shield Statute]; and because the information he seeks poses no threat to South Carolina's ability to impose death sentences." [*Id*. at 5.]

The Court denied Owens's motion on September 18, 2024, concluding that he had failed to make a showing of a likelihood of success on the merits. [Doc. 19.]  In Owens's motion, he had argued only that he was likely to succeed on the portion of his claim alleging that South Carolina law creates a liberty interest in his being able to make an informed decision about which execution method is least inhumane and about whether the three execution methods are constitutional, and that South Carolina's failure to provide the information necessary to make that decision violated his due process rights under the Fourteenth Amendment. [Doc. 5 at 5–15; *see* Doc. 1 ¶¶ 33–36, 38–43.]  The Court concluded that Owens had failed to show that he was likely to succeed in demonstrating that South Carolina has created such a liberty interest. [Doc. 19 at 13–16.]

The Fourth Circuit Court of Appeals and the United States Supreme Court both denied Owens's motions for a stay of execution, *Owens v. Stirling*, No. 24-3 (4th Cir. Sept. 20, 2024); No. 24-5603 (U.S. Sept. 20, 2024), and Owens was executed on September 20, 2024 [*see* Doc. 26].

## APPLICABLE LAW

**Section 1983**

Section 42 U.S.C. § 1983 provides a private cause of action for constitutional violations by persons acting under color of state law.  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).   Accordingly, a civil action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). The Supreme Court has held that prisoners can bring method-of-execution claims under § 1983.  *See Nance v. Ward*, 597 U.S. 159, 168–75 (2022).

**Rule 12(b)(1) Standard**

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure examines whether the complaint fails to state facts upon which jurisdiction can be founded.  Fed. R. Civ. P. 12(b)(1).  The court may dismiss a case for lack of subject-matter jurisdiction on any of the following bases: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Johnson v. United States*, 534 F.3d 958, 962 (8th Cir. 2008) (internal quotation marks omitted).

**Rule 12(b)(6) Standard**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim should be dismissed if it fails to state a claim upon which relief can be granted.  When considering a motion to dismiss, the court should "accept as true all well-pleaded allegations and

should view the complaint in a light most favorable to the plaintiff." *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, the court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Further, for purposes of a Rule 12(b)(6) motion, a court may rely on only the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31–32 (4th Cir. 1985). If matters outside the pleadings are presented to and not excluded by the court, the motion is treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(d).

With respect to well pleaded allegations, the United States Supreme Court explained the interplay between Rule 8(a) and Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

550 U.S. 544, 555 (2007) (footnote and citations omitted); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than a bare averment that the pleader

wants compensation and is entitled to it or a statement of facts that merely creates a suspicion that the pleader might have a legally cognizable right of action.").

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. The plausibility standard reflects the threshold requirement of Rule 8(a)(2)—the pleader must plead sufficient facts to show he is entitled to relief, not merely facts consistent with the defendant's liability. *Twombly*, 550 U.S. at 557; *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)). Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible the plaintiff is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

## <u>DISCUSSION</u>

**The Parties' Arguments**

The Moving Parties have moved to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) for several reasons. [Doc. 25.] First, they argue that Plaintiffs' as-applied challenge fails for two reasons: (1) Plaintiffs are precluded from relitigating this issue in this Court, and (2) the claim fails on the merits. [*Id*. at 8–17.] Second, the Moving Parties argue that the Shield Statute is constitutional and that Plaintiffs' four facial attacks have no merit. [*Id*. at 17–22.] Third, the Moving Parties contend that Plaintiffs have not

been denied access to the courts [*id*. at 22–26] and have not been denied their right to counsel [*id*. at 26].  Finally, the Moving Parties argue that SCDC is entitled to Eleventh Amendment immunity.[3]  [*Id*. at 26–27.]

In response, Plaintiffs argue that they are not precluded from bringing their procedural due process claim based on collateral estoppel.  [Doc. 27 at 3–6.]  Plaintiffs also argue that they have demonstrated, as a matter of law, that they have a state-created liberty interest and, therefore, are entitled to due process.  [*Id*. at 7–10.]  Further, Plaintiffs argue that the Moving Parties' remaining arguments for dismissal of their due process claim prematurely go to the merits and are not appropriate considerations at the motion to dismiss stage.  [*Id*. at 10–15.]  Finally, Plaintiffs argue that the Moving Parties' position on Plaintiffs' access to courts and right to counsel fails to appreciate the unique legal landscape created by the Shield Statute and the Moving Parties' interpretation of that law. [*Id*. at 15–17.]

**Subject-Matter Jurisdiction**

Because the Court has concerns regarding its subject-matter jurisdiction, the Court will begin by addressing that issue.

---

[3] Plaintiffs have indicated they "have no objection to SCDC being dismissed as a defendant pursuant to its sovereign immunity."  [Doc. 27 at 17 n.11.]  The Court notes that SCDC is entitled to be dismissed without prejudice based on Eleventh Amendment immunity.  *See Brown v. S.C. Dep't of Corr.*, No. 8:20-cv-01159-TMC-JDA, 2020 WL 3001787, at *3 (D.S.C. May 15, 2020) ("SCDC, as a South Carolina state agency, is an integral part of the state and, thus, entitled to Eleventh Amendment immunity in this case."), *Report and Recommendation adopted by* 2020 WL 2994234 (D.S.C. June 4, 2020); *see also Hong Tang v. Univ. of Baltimore*, 782 F. App'x 254, 255 (4th Cir. 2019) (noting that a dismissal based on Eleventh Amendment immunity is without prejudice).  Thus, SCDC is dismissed from this action, and the remainder of this Order addresses Plaintiffs' claims against Stirling.

*Jurisdictional Principles*

A federal court is required to determine, sua sponte, whether it possesses subject-matter jurisdiction "and to dismiss the action if no such ground appears." *In re Bulldog Trucking, Inc.*, 147 F.3d 347, 352 (4th Cir. 1998). Article III of the United States Constitution limits a federal court's jurisdiction to deciding only actual "[c]ases" and "[c]ontroversies,"[4] *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 559 (1992), and "[o]ne element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (internal quotation marks omitted).

The doctrines of standing, ripeness, and mootness are "subsets of Article III's command that the courts resolve disputes, rather than emit random advice." *Bryant v. Cheney*, 924 F.2d 525, 529 (4th Cir. 1991). "The party attempting to invoke federal jurisdiction bears the burden of establishing standing." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up); *see Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009) ("[T]he party invoking the jurisdiction of the court must include the necessary factual allegations

---

[4] The Court notes that a case or controversy is also specifically required for courts to resolve a declaratory judgment action as the statutes comprising the Declaratory Judgment Act authorize federal courts to "declare the rights and other legal relations of" interested parties "[i]n a case of *actual controversy* within its jurisdiction." 28 U.S.C. § 2201 (emphasis added); *see Delavigne v. Delavigne*, 530 F.2d 598, 601 (4th Cir. 1976) ("[T]he [Declaratory Judgment] Act does not supply its own jurisdictional base, and where jurisdiction is lacking, declaratory relief should be denied."). And plaintiffs seeking declaratory relief must identify "some further concrete relief that will likely result from the declaratory judgment." *Comite de Apoyo a los Trabajadores Agricolas (CATA) v. U.S. Dep't of Lab.*, 995 F.2d 510, 513 (4th Cir. 1993).

in the pleading, or else the case must be dismissed for lack of standing."). "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990).

To possess Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. "[S]tanding is measured at the time suit is filed." *Columbia Cas. Co. v. McCabe Trotter & Beverly, PC*, No. 2:20-cv-3680-DCN, 2021 WL 2337188, at *3 (D.S.C. June 8, 2021); *see Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) (explaining that jurisdiction "depends upon the state of things at the time of the action brought" (internal quotation marks omitted)); *Lujan*, 504 U.S. at 570 n.5 ("[S]tanding is to be determined as of the commencement of the suit."). "[W]hen a plaintiff's purported injury is one that has not yet occurred, the injury must be 'certainly impending'; an allegation of a 'possible future injury' is not sufficient." *Patrick v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 860 F. App'x 828, 833 (4th Cir. 2021) (quoting *Clapper*, 568 U.S. at 409–10).

"Standing is not dispensed in gross," and instead, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up); *see Warth v. Seldin*, 422 U.S. 490, 518 (1975) ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."). In cases with multiple plaintiffs "where each plaintiff seeks *identical* relief, the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Elrod v. WakeMed*, No. 21-2203, 2023 WL 1256601,

at *3 (4th Cir. Jan. 31, 2023) (internal quotation marks omitted).  "But where plaintiffs seek to recover *individual* relief . . . *each* plaintiff must establish standing."  *Id.*

The ripeness requirement serves "to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."[5]  *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (internal quotation marks omitted).  The Fourth Circuit explained in *Whitaker v. Monroe Staffing Services, LLC*, 42 F.4th 200, 206 (4th Cir. 2022):

> A case is not ripe for judicial determination "if the plaintiff has not yet suffered injury and any future impact remains wholly speculative."  *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (citation and internal quotation marks omitted).  In contrast, a case is ripe for judicial decision when the "controversy is final and not dependent on future uncertainties."  *Id.* (citation omitted).  Thus, when a claim is "presented in a clean-cut and concrete form," the issue is ripe for adjudication.  *South Carolina*, [*v. United States*, 912 F.3d 720, 730 (4th Cir. 2019)] (citation omitted).  The plaintiff bears the burden of establishing ripeness.  *Doe*, 713 F.3d at 758.

"In reviewing a ripeness claim, [courts] consider (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018) (internal quotation marks omitted).  "An issue is not fit for review if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 188 (4th Cir. 2007) (internal quotation marks omitted).

Finally, "[m]ootness has been described as the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the

---

[5] In addition to the limits the Constitution places on federal court jurisdiction, the ripeness doctrine is drawn from "prudential reasons for refusing to exercise jurisdiction."  *Reno v. Cath. Soc. Servs. Inc.*, 509 U.S. 43, 57 n.18 (1993).

litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Off. English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (internal quotation marks omitted). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969).

### *Application of Jurisdictional Principles to Plaintiffs' Claims*

<u>Owens</u>

Initially, the Court notes that because Owens has been executed, his claims—which are for declaratory and injunctive relief—are moot. *See Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 549 (6th Cir. 2003) (holding that any claim for injunctive relief asserted on behalf of a deceased inmate was rendered moot by the inmate's death); *Copsey v. Swearingen*, 36 F.3d 1336, 1339 n.3 (5th Cir. 1994) (holding that claims for injunctive and declaratory relief were rendered mooted by the plaintiff's death). Therefore, the Court dismisses all claims brought by Owens.

<u>The Remaining Plaintiffs</u>[6]

Regarding the remaining Plaintiffs (the "Remaining Plaintiffs"), the Court concludes that it possesses jurisdiction over some but not all of their claims. Although the Complaint purports to assert four causes of action, several of Plaintiffs' claims that are styled as individual claims actually contain multiple claims, and several claims that are styled as separate claims actually overlap. The Court reads the Complaint as asserting two categories of claims: (1) challenges to the Shield Statute and (2) challenges to

---

[6] Rule 25(a)(2) of the Federal Rules of Civil Procedure provides that "[a]fter a party's death, if the right sought to be enforced survives only to . . . the remaining parties, the action does not abate, but proceeds in favor of . . . the remaining parties."

20

Defendants' refusal to provide information about Owens's execution that the Shield Statute does not protect (the "Owens Certification Challenges").

### a. Challenges to the Shield Statute

The Remaining Plaintiffs' claims include a facial challenge to the constitutionality of the Shield Statute [Doc. 1 ¶¶ 44–58] and an as-applied challenge to that statute, namely, that the Shield Statute's bar to the Remaining Plaintiffs' ability to receive certain information violates their federal and state constitutional rights to access the courts as well as their statutory right to assistance of counsel. [*Id.* ¶¶ 59–73.] For reasons that will be explained, the Court concludes as an initial matter that it possesses jurisdiction over the Remaining Plaintiffs' claims regarding the Shield Statute.

The Remaining Plaintiffs allege that the Shield Statute is currently blocking them from learning information to which they are constitutionally entitled. [*Id.* ¶¶ 44–58, 62, 73.] They allege that the statute is preventing them from being able to make an informed choice regarding the least inhumane execution method; to reduce the risk that their executions by lethal injection will be unnecessary painful; to discover whether their execution violates their Eighth Amendment rights; and to effectively litigate possible constitutional claims. [*Id.*] The Remaining Plaintiffs contend that access to this information is necessary to remedy their alleged injuries. [*Id.* ¶ 74(a).]

The Court concludes that the type of injury alleged by the Remaining Plaintiffs is sufficient to establish standing at the pleadings stage. *See Phillips v. DeWine*, 841 F.3d 405, 416 n.9 (6th Cir. 2016) ("The [p]laintiffs essentially argue that they are entitled to know the identity of the drug manufacturers, that [the statute at issue] prevents them from obtaining this information, and that access to the manufacturers' identity would remedy

their injury.  This is sufficient to meet all three standing prongs for this claim."); *see also Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 165–74 (4th Cir. 2023) (holding that the plaintiff had alleged a sufficient informational injury for Article III standing when she sought information to which she claimed entitlement); *Fisher v. King*, 232 F.3d 391, 396 & n.5 (4th Cir. 2000) (holding that a plaintiff suing to recover a copy of a 911 tape that was evidence in his murder trial established Article III standing because he showed injury in fact from his lack of possession of the tape, causation by the defendant's refusal to give him access to the tape, and a substantial likelihood that the requested relief would remedy the injury because release of the tape would remedy his alleged injury).  The Court also concludes that, as of the date Plaintiffs filed their Complaint, these challenges were well beyond the point of abstraction.  All indications were that execution notices for the Remaining Plaintiffs would be forthcoming in the weeks and months following the Complaint, in line with the state supreme court's order of August 30, 2024.[7]  [Doc. 1-4.] And the Remaining Plaintiffs' challenges could be redressed if the Court were to declare that the Shield Statute were unconstitutional.  Accordingly, the Court concludes that the Remaining Plaintiffs have adequately alleged standing and ripeness for their facial and as-applied challenges to the Shield Statute.[8]  *Cf. Pizzuto v. Tewalt*, 997 F.3d 893, 899–

---

[7] The state supreme court issued an execution notice for Plaintiff Richard Bernard Moore on October 4, 2024, setting November 1, 2024, as his execution date, and Stirling has since certified that lethal injection is available as an execution method for Moore.  [Docs. 27-1; 27-2.]

[8] As has often been recognized, "[r]ipeness and standing are related concepts that are not entirely distinct and in practice there is an obvious overlap between the two doctrines." *South Carolina State Conf. of NAACP v. Wilson*, No. 2:23-cv-01121-DCN, 2023 WL 5207978, at *5 (D.S.C. Aug. 14, 2023) (internal quotation marks omitted); *see generally* Michael Aaron DelGaudio, *From Ripe to Rotten: An Examination of the Continued Utility*

904 (9th Cir. 2021) (concluding that death row prisoners' claims seeking execution-related information were ripe even though the prisoners had ongoing post-conviction litigation and had not yet been issued death warrants).

### b.  The Owens Certification Challenges

As explained, as the Court reads the Complaint, the remainder of the Remaining Plaintiffs' claims are based on Defendants' refusal to provide information regarding Owens's execution that the Shield Statute does not protect.  [Doc. 1 ¶¶ 33–43, 59–73.] For reasons that will be explained, the Court concludes that it does not possess jurisdiction over the Owens Certification Challenges.

As previously stated, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Davis*, 554 U.S. at 734 (internal quotation marks omitted).   And where "plaintiffs seek to recover *individual* relief . . . *each* plaintiff must establish standing."  *Elrod*, 2023 WL 1256601, at *3.   The Remaining Plaintiffs seek individual remedies for the Owens Certification Challenges, including injunctive relief preventing each of their executions until certain information is given to them regarding their executions.  [Doc. 1 ¶ 74.]  Accordingly, each Remaining Plaintiff is required to allege facts supporting standing as to these claims.  *See Elrod*, 2023 WL 1256601, at *3.  Upon considering the allegations in the Complaint, the Court determines that the Remaining Plaintiffs have not alleged standing regarding the Owens Certification Challenges.

---

*of the Ripeness Doctrine in Light of the Modern Standing Doctrine*, 50 Ga. L. Rev. 625 (2016).

Under the Death Penalty Statute, each time SCDC receives a new execution notice, the Director certifies which execution methods are available for that particular execution. *See* S.C. Code § 24-3-530(B). Much could change from one execution to the next. For example, SCDC could exhaust its supply of drugs; it could determine that its supply is too old or otherwise degraded to be adequate for use in future executions; there could be complications or problems conducting an execution; or new legal concerns could arise. In the end, the Director's certification regarding Owens's execution is of little direct relevance to the Remaining Plaintiffs. Rather, of primary importance to each condemned prisoner are the facts relating to his own execution, the determinations the Director makes based on those facts, and the level of detail he provides in that prisoner's individual certification. For that reason, it does not appear that the Remaining Plaintiffs have plausibly alleged that they have been injured by Defendants' refusal to provide the Additional Information about Owens's execution or that any injury from that refusal is "certainly impending."[9] The Court therefore concludes that the Remaining Plaintiffs have

---

[9] That is not to say that the Remaining Plaintiffs do not have a significant interest in the outcomes of the other prisoners' cases. Indeed, the precedents established by the other prisoners' cases may be useful or harmful to future claims, but that is an issue separate from whether the Remaining Plaintiffs have alleged injury to themselves from Defendants' refusal to provide information about Owens's execution or that such an injury is "certainly impending."

The Court recognizes that it could be argued that, as with the Owens Certification Challenges, too much contingency existed at the time of the filing of the Complaint for the Remaining Plaintiffs to have standing to challenge the Shield Statute. In particular, as of the time of filing, it had not yet been decided that lethal injection would be available as an execution method for any of the Remaining Plaintiffs even assuming they were issued execution notices. The difference between the Owens Certification Challenges and the Shield Statute challenges, however, is that at the time the Complaint was filed, no contingency remained concerning whether the Remaining Plaintiffs would receive the information they sought under the Shield Statute challenges. The existence of the Shield Statute ensures that they will not receive any of the information the Shield Statute

failed to allege standing for the Owens Certification Challenges, and the Court dismisses those claims without prejudice.[10]

**The Motion to Dismiss Regarding the Remaining Plaintiffs' Challenges to the Shield Statute**

Having determined that the Court possesses jurisdiction over the Remaining Plaintiffs' facial and as-applied challenges to the Shield Statute, the Court now turns to the merits of those claims.[11]  The Moving Parties argue that the Complaint fails to state a

---

protects, including the professional qualifications of any person or entity that compounds or manufactures the execution drugs, the professional qualifications of members of the execution team, and information about compliance with federal regulations regarding importation of execution drugs.  *See* S.C. Code § 24-3-580(A)(1)–(2), (B), (C), (G).  This difference, in the Court's view, is sufficient to push the Remaining Plaintiffs' allegations over the line at the pleadings stage as to standing to assert the Shield Statute challenges, albeit barely.

[10] For similar reasons, the Court concludes that the Remaining Plaintiffs have failed to adequately plead that their claims are ripe.  The Court notes that it perceives no particular hardship to the parties in withholding court consideration of these claims until each of their execution notices is issued and the Director issues his certification as to the available execution methods.  *See Deal*, 911 F.3d at 191.  Having already decided Owens's motion for emergency relief and studied the parties' briefs and arguments concerning the present motion, this Court is now well acquainted with these issues.  Thus, the Court will be prepared to issue a prompt decision at the appropriate time should any of the Remaining Plaintiffs raise similar challenges once their claims ripen.  Indeed, the Court has noted that, since the filing of the Complaint, an execution notice has been issued for Moore and that Stirling has issued his certification as to Moore's execution.  [Docs. 27-1; 27-2.]

[11] An as-applied challenge to the constitutionality of a statute asserts that it is unconstitutional based on "the application of [the] statute to a specific person."  *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc).  A facial challenge, on the other hand, tests only "a facial reading of the statute."  *Id.*  A plaintiff asserting a facial challenge

> may sustain its burden in one of two ways.  First, the plaintiff may demonstrate that no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep.  Second, the plaintiff may show that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly

constitutional or statutory violation regarding either the facial or the as-applied claims.[12]
[Doc. 25 at 11–26.]   The Remaining Plaintiffs dispute that Defendants are entitled to
dismissal and maintain that dismissal at the pleadings stage would be premature.   [Doc.
27 at 3–17.]

Under the Due Process Clause of the Fourteenth Amendment, a state may not
"deprive any person of life, liberty, or property, without due process of law."  U.S. Const.
amend. XIV.   "To state a procedural due process violation [under the Fourteenth
Amendment], a plaintiff must (1) identify a protected liberty or property interest and

---

legitimate sweep.  In either scenario, a court must assess the
constitutionality of the challenged law without regard to its
impact on the plaintiff asserting the facial challenge.

*Fusaro v. Howard*, 19 F.4th 357, 363 n.6 (4th Cir. 2021) (cleaned up).  However, "[t]he
label is not what matters."  *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (concluding
that a claim asserted a facial challenge because the claim and the relief that would follow
"reach[ed] beyond the particular circumstances of [the] plaintiffs").  Here, although the
Complaint categorizes its "Claim Two" as a "facial challenge," the Court is not convinced
that the Complaint alleges a facial challenge because the claim and the relief that would
follow do not appear to reach beyond the Remaining Plaintiffs' particular
circumstances. [*See, e.g.,* Doc. 1 ¶¶ 45 ("The denial of this information also impairs
*Plaintiffs'* ability to make an informed and meaningful choice about their method of
execution." (emphasis added)), 46 (alleging that the Shield Statute "prevent[s] *Plaintiffs*
from finding out the information needed" (emphasis added)), 58 ("Accordingly, the
provisions of S.C. Code § 24-3-580 discussed here, on their face, violate *Plaintiffs'* state
and federal rights to procedural due process." (emphasis added)), 74 (seeking injunctive
and declaratory relief regarding "*Plaintiffs'* executions" and "*Plaintiffs'* constitutional and
statutory rights) (emphasis added)).]  Nonetheless, even if the Remaining Plaintiffs have
alleged both a facial challenge and an as-applied challenge, the Court concludes, for the
reasons that will be discussed, that both challenges fail to state a claim for the same
reason.  Thus, the Court addresses the facial and as-applied challenges together.

[12]  The Moving Parties also argue that the doctrine of collateral estoppel bars the
Remaining Plaintiffs' as-applied challenge to the adequacy of information provided in
Stirling's certification as to Owens's execution.  [Doc. 25 at 8–11.]  Because the Court
concludes that the Remaining Plaintiffs have failed to establish standing regarding the
Owens Certification Challenges, it need not consider the collateral estoppel argument.

(2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citation omitted).

The Court begins by addressing the Remaining Plaintiffs' claims related to liberty interests that they contend arise from the Constitution itself. The Remaining Plaintiffs allege that the Shield Statute's denial of information about the manufacturing or compounding process, denial of information about the execution team's professional qualifications, exemption from regulatory and licensing requirements, and denial of information about compliance with federal regulations impairs their constitutional interest in their right to be free from a substantial risk of serious pain. [Doc. 1 ¶¶ 44–58.] They also allege that the Shield Statute deprives them of information they need to determine whether lethal injection will violate their Eighth Amendment right not to be subject to cruel and unusual punishment and to litigate possible Eighth Amendment claims, and, thus, violates their federal and state constitutional rights to access the courts and infringes on their statutory right to assistance of counsel. [*Id.* ¶¶ 59–73.]

The Court notes that "[t]he United States Court of Appeals for the Fourth Circuit has never decided whether a death row inmate has a right to discover information pertaining to his execution[,] . . . [b]ut every other circuit to address a prisoner's procedural due process challenge to a secrecy statute has squarely rejected it." *Gray v. McAuliffe*, No. 3:16CV989-HEH, 2017 WL 102970, at *19 (E.D. Va. Jan. 10, 2017). Specifically, the Eleventh Circuit has held that a prisoner has no procedural due process right "to know

27

where, how, and by whom the lethal injection drugs will be manufactured, as well as the qualifications of the person or persons who will manufacture the drugs, and who will place the catheters." *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1292–93 (11th Cir. 2016) (internal quotation marks omitted).    The Fifth, Sixth, and Eighth Circuits have reached similar conclusions. *See Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014) (per curiam) ("A due process right to disclosure requires an inmate to show a cognizable liberty interest in obtaining information about execution protocols. . . .   However, we have held that an uncertainty as to the method of execution is not a cognizable liberty interest."); *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016) ("Plaintiffs argue that HB 663 prevents them from bringing an effective challenge to Ohio's execution procedures. Specifically, they maintain that HB 663 denies them an opportunity to discover and litigate non-frivolous claims.  But no constitutional right exists to discover grievances or to litigate effectively once in court." (cleaned up)); *Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir. 2015) (en banc) (concluding that the Constitution does not require detailed disclosure about a state's execution protocol and that a "prisoner's assertion of necessity—that the State must disclose its protocol so he can challenge its conformity with the Eighth Amendment—does not substitute for the identification of a cognizable liberty interest" (cleaned up)).[13]

---

[13] The Court recognizes that the Ninth Circuit reached a different result addressing a similar claim in *Wood v. Ryan*, 759 F.3d 1076 (9th Cir. 2014), *vacated*, 573 U.S. 976 (2014).  In that case, the prisoner sought information from the Arizona Department of Corrections concerning his method of execution and contended that the Department violated his First Amendment rights by refusing to provide the information. *Id.* at 1077–79.  The district court denied the prisoner's motion for a preliminary injunction, but the Ninth Circuit reversed, holding that "Wood has presented serious questions going to the merits of his claim." *Id.* at 1078–79.  The Supreme Court reversed the Ninth Circuit without opinion or dissent, however, and granted the state's application to vacate the

The Court agrees, for the reasons explained by these courts, that a death row inmate does not have a constitutional right to discover information pertaining to his execution.[14]  *See Phillips*, 841 F.3d at 420; *Jones*, 811 F.3d at 1292–93; *Zink*, 783 F.3d at 1109; *Trottie*, 766 F.3d at 452.  The result is no different if the claimed source of the right is a right to access to the courts.[15]  *Creech v. Tewalt*, 84 F.4th 777, 791–92 (9th Cir.

---

judgment.  573 U.S. 976.  Since that time, the Ninth Circuit has rejected an argument that the First Amendment entitled plaintiffs "to information regarding the manufacturers, sellers, lot numbers, National Drug Codes, and expiration dates of lethal-injection drugs, as well as documentation regarding the qualifications of certain execution team members" on the bases that "the First Amendment does not mandate a right of access to government information or sources of information within the government's control."  *First Amend. Coalition of Ariz., Inc. v. Ryan*, 938 F.3d 1069, 1078–80 (9th Cir. 2019) (cleaned up); *see also Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (holding that "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control"); *id.* at 16 (Stewart, J., concurring in the judgment) ("The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by the government.").

[14] The Remaining Plaintiffs argue that although many courts have rejected the proposition that death-sentenced prisoners have a constitutional right to information regarding execution procedures, "South Carolina is unique" insofar as South Carolina officials have taken "the position that they have authority under state law to refuse to provide any information whatsoever about execution drugs or procedures."  [Doc. 27 at 16.]  However, they do not provide support for their assertion that South Carolina has taken the position that it can refuse to produce "any information whatsoever" about the drugs when Stirling provided information about the drugs in his certification regarding Owens's execution.  [*See* Doc. 1-3 ¶ 10.]

[15] As for the Remaining Plaintiffs' allegation that the Shield Statute violates their rights under Article I, Section 22 of the South Carolina constitution [Doc. 1 ¶ 62], that provision provides:

> No person shall be finally bound by a judicial or quasi-judicial decision of an administrative agency affecting private rights except on due notice and an opportunity to be heard; nor shall he be subject to the same person for prosecution and adjudication; nor shall he be deprived of liberty or property unless by a mode of procedure prescribed by the General

2023) (affirming the denial on futility grounds of a motion to amend a complaint to allege a claim that refusal to give condemned prisoners execution-related information infringed their First Amendment right of access to courts); *Phillips*, 841 F.3d at 420; *Zink*, 783 F.3d at 1108.   And, with the Remaining Plaintiffs having no constitutional right to such information, the Shield Statute does not infringe their statutory right to counsel by prohibiting counsel from receiving it.   Accordingly, the Court concludes that the Complaint fails to state a procedural due process claim based on a liberty interest arising from the Constitution itself.

The Court next addresses the Remaining Plaintiffs' claims related to their alleged state-granted right to choose a method of execution that is less inhumane than other options.   To establish the existence of a state-created liberty interest, a prison inmate must first show that a state statute, regulation, or policy "creates an objective expectation in the liberty interest in such a way that an inmate could reasonably expect to enforce it against prison officials."   *Desper v. Clarke*, 1 F.4th 236, 247 (4th Cir. 2021) (cleaned up). The Remaining Plaintiffs argue that *Owens* established their "liberty interest in sufficient information about the execution process."   [Doc. 27 at 8.]   The Court concludes, however,

---

Assembly, and he shall have in all such instances the right to judicial review.

S.C. Const. Art. I, § 22.   The Remaining Plaintiffs do not specify—either in the Complaint or in their response opposing the Moving Parties' motion to dismiss—why they believe their rights under this provision were violated.   In any event, the provision "does not create a property right, but rather it merely protects one already in existence."   *Bunting v. City of Columbia*, 639 F.2d 1090, 1094 n.8 (4th Cir. 1981).   Because the Court has held that the Remaining Plaintiffs have not shown any liberty interest in discovering information relevant to their execution, this constitutional provision is not relevant.   *See id.*

that South Carolina has not created the liberty interest the Remaining Plaintiffs allege and thus they have failed to state a claim under this legal theory.

In adjudicating the state constitutionality of South Carolina's provision allowing condemned inmates to choose their execution method, the *Owens* court noted that one benefit of being allowed this choice is that the inmate "may elect to have the State employ the method *he and his lawyers believe* will cause him the least pain."  904 S.E.2d at 608 (emphasis added).  The *Owens* court noted that this ability to choose ensures that "a condemned inmate in South Carolina will never be subjected to execution by a method *he contends* is more inhumane than another method."  *Id.* (emphasis added).

Initially, the Court notes that *Owens* could not have created a liberty interest that the Shield Statute infringes because *Owens* made clear that prisoners are not entitled to information that the Shield Statute protects.  *See, e.g.*, *id.* at 605 ("We reiterate that the Director must comply with the [S]hield [S]tatute.").  In any event, the arguments of the Remaining Plaintiffs notwithstanding, condemned prisoners remain allowed to choose the execution method they and their lawyers believe is best for them, using whatever criteria they prefer, based on all of the information available to them.  That is all that the right to elect their execution method provides.[16]  *See Woods v. Dunn*, No. 2:20-cv-58-ECM, 2020 WL 1015763, at *12 (M.D. Ala. Mar. 2, 2020) (holding that Alabama's death penalty laws, which allow condemned prisoners to choose between death by lethal injection,

---

[16] The Court acknowledges that the Death Penalty Statute also provides the Remaining Plaintiffs with a right to have the Director explain the process he used to satisfy himself that the SCDC has drugs that are adequate to conduct an execution by lethal injection. *See Owens*, 904 S.E.2d at 604–05.  However, as explained, the Remaining Plaintiffs have not alleged standing in this case to challenge the adequacy of any certification Stirling has already provided.

electrocution, or nitrogen hypoxia, did not confer upon the prisoners the right to know, when making their election, that the Alabama Department of Corrections had not yet developed a protocol for performing nitrogen hypoxia executions; explaining that the only interest that Alabama's death penalty laws conferred was the opportunity to choose the execution method), *stay of execution denied*, 951 F.3d 1288 (11th Cir. 2020). Accordingly, the Court concludes that the Complaint fails to state a procedural due process claim based on a state-created liberty interest.[17]

Because the Complaint fails to identify a protected liberty or property interest, the Remaining Plaintiffs have not stated a claim for a procedural due process violation, either facially or as applied.[18]  *See Prieto*, 780 F.3d at 248.  Nor has it alleged facts showing

---

[17] Plaintiffs further allege that subsection (J) of the Shield Statute establishes their interest in having SCDC "comply with federal regulations regarding the importation of any execution drugs," S.C. Code § 24-3-580(J), but that "the very same statute impairs that interest by preventing Plaintiffs from finding out the information needed to confirm that actual compliance has occurred."  [Doc. 1 ¶ 46; *see id.* ¶ 51 (alleging that the Shield Statute "in subsections (A)(1), (C), and (G), prohibits disclosure of the information necessary to determine whether federal compliance has actually occurred.  For example, subsection (G) prohibits disclosure of 'details regarding the procurement and administrative processes . . . .").]  To the extent that Plaintiffs contend that subsection (J), which provides simply that SCDC "shall comply with federal regulations regarding the importation of any execution drugs," creates a liberty interest in condemned prisoners in being allowed to independently verify that SCDC is fulfilling its obligations, Plaintiffs are simply incorrect.

[18] For these same reasons, the Complaint fails to state a claim that the Shield Statute violates Article I, Section 3 of the South Carolina constitution.  South Carolina courts apply the same analysis to state and federal due process claims.  *See, e.g.*, *Dangerfield v. State*, 656 S.E.2d 352, 354 (S.C. 2008) (applying federal due process law to claims under both the Fourteenth Amendment to the United States Constitution and Article I, Section 3 of the South Carolina constitution); *cf. Sandlands C&D, LLC v. Cnty. of Horry, a Pol. Subdivision of S.C.*, No. 4:09-cv-1363-TLW, 2013 WL 12137692, at *12 (D.S.C. Jan. 3, 2013) ("The South Carolina Supreme Court applies the same standard for analyzing contract clause claims under the state constitution as federal courts apply to the Contract Clause under the federal constitution.  As a result, this Court concludes that there is no

that it violates their statutory right to counsel.  Accordingly, the Court dismisses the Remaining Plaintiffs' claims challenging the Shield Statute.[19]

<u>**CONCLUSION**</u>

Wherefore, based upon the foregoing, the claims brought by Owens are DISMISSED without prejudice, and the Remaining Plaintiffs' Owens Certification Challenges are DISMISSED without prejudice for lack of standing and ripeness.  The Moving Parties' motion to dismiss [Doc. 25] is GRANTED IN PART.  The motion is GRANTED without prejudice as to all claims against SCDC based on Eleventh Amendment immunity, and the motion is GRANTED with prejudice as to the Remaining Plaintiffs' claims challenging the Shield Statute.

IT IS SO ORDERED.

s/ Jacquelyn D. Austin
United States District Judge

October 30, 2024
Columbia, South Carolina

---

violation of the contract clause under the state constitution for the same reason there is no violation under the federal constitution." (internal citations omitted)).

[19] Although the Remaining Plaintiffs argue that the Moving Parties' arguments for dismissing these claims prematurely address the merits of the case and are not appropriate considerations at the motion to dismiss stage [Doc. 27 at 10–15], they still agree that "[a]t the motion to dismiss stage, the Court should determine whether [the Remaining] Plaintiffs have a liberty interest that triggers procedural due process protections" [*id.* at 14].  That is exactly what the Court has done.  The Court has "accept[ed] as true all well-pleaded allegations" and viewed the Complaint "in a light most favorable to" the Remaining Plaintiffs."  *Mylan Lab'ys, Inc.*, 7 F.3d at 1134.  Because the allegations, even viewed in that manner, do not identify a protected liberty or property interest, Defendants are entitled to dismissal of the claims under Rule 12(b)(6).